Raymond J. DONOVAN, Successor to Ray Marshall, Secretary of the United States Department of Labor,

v.

Kenneth R. CUNNINGHAM et al.

Civ. A. No. H–80–87.

United States District Court, S. D. Texas, Houston Division.

May 21, 1982.

Anna E. Stool, Asst. U. S. Atty., Local Counsel, Houston, Tex., Samuel W. Halpern, in charge, U. S. Dept. of Labor, Washington, D. C., for plaintiff.

C. Leland Hamel, Dickerson, Hamel, Early, Pennock, Van E. McFarland, Co-counsel, McFarland & Tondre, Morton L. Susman, Susman & Kessler, Larry D. Thompson, Atty. in Charge, Lorance & Thompson, Tom M. Davis, Jr., Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

SINGLETON, Chief Judge.

This cause was filed January 14, 1980 by the Secretary of the United States Department of Labor against the members of the Administrative Committee of the Employee Stock Ownership Plan (ESOP) of Metropolitan Contract Services, Inc. (MCS). The defendants were either members of the Administrative Committee at the time of the two stock transactions which form the basis of the complaint or became members shortly afterwards.

The action arises under the Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. 1001 et seq. The plaintiff, Secretary of the Department of Labor, bases his case on various specific provisions of ERISA.

The plaintiff seeks comprehensive relief; that the defendants be enjoined from any acts in violation of their fiduciary duties under ERISA; that the defendants restore the Plan to its rightful economic place by rescission of the stock sales in question, and that the money paid to Defendant Cunningham by the Plan be returned to the Plan together with interest; that the Defendants Cunningham, Carter, Hairell, Perrin, and Robertson be removed as fiduciaries of the Plan and that all defendants be permanently enjoined from serving as fiduciaries with respect to this Plan, and for an additional period of five years that they be enjoined from serving as fiduciaries of any other employee benefit plan covered by ERISA and that the court appoint an independent successor fiduciary to administer and manage the Plan assets and for costs and general relief.

Defendants L. J. Carter and Mark W. Perrin brought a third-party action against Allied Bank of Texas (Allied), the Plan trustee at all times relevant to this lawsuit, on the grounds that if they were found liable for violations of ERISA, then in that event Allied would be liable to them on various theories; also Defendants Salvadore Esparza, Edward F. Fritcher, Perrin and Carter brought third-party actions against MCS and a cross-action against Defendant Cunningham claiming in essence that they were indemnified by certain documents and instruments in the event they were found liable for fiduciary breaches.

Allied, as counter-plaintiff and third-party plaintiff, brought suit against MCS and its ESOP as third-party defendants and against Defendants Cunningham, Wilford H. Hairell, A. Michael Robertson, Perrin and Carter, as counter-defendants, claiming indemnity under an agreement entered into between Defendant Cunningham and Allied with respect to a loan made to the ESOP to finance one of the stock purchases in question and based on Plan indemnification provisions which Allied claims indemnifies it generally in connection with its service as trustee of the MCS ESOP.[1] Additionally, Allied seeks recovery of its fees and ex-

---

1. Metropolitan Contract Services, Inc. Employee Stock Ownership Plan, section 17G (upon which Allied bases its claim for indemnity from MCS) provides in pertinent part:

The Company shall indemnify each member of the Board of Directors, each member of the Committee, the trustee and any other person to whom any fiduciary responsibility with respect to the plan is allocated or dele-gated from and against any and all liabilities, costs, and expenses incurred by such persons as a result of any act or omission to act in connection with the performance of their fiduciary duties, responsibilities and obligations under the Plan and under the Act, except for liabilities and claims arising from such fiduciary's willful misconduct...

penses incurred in defense of this suit under the indemnity agreements and under section 502(g)(1) of ERISA, 29 U.S.C. 1132(g)(1).[2]

The defendants except Cunningham have applied under the newly enacted Equal Access to Justice Act, 28 U.S.C. 2412(d)(1)(A)[3] for fees and expenses incurred in this suit. Defendant Cunningham has applied for attorney's fees and expenses under section 502(g)(1) of ERISA, 29 U.S.C. 1132(g)(1) and 28 U.S.C. 2412(a) and (b).[4]

Essentially, plaintiff claims that, by causing the ESOP to purchase 1440 shares of MCS on August 11, 1976 and 5000 shares of MCS on February 18, 1977 from Kenneth R. Cunningham for $200.00 per share, defendants (excepting Perrin and Carter) violated ERISA. Specifically plaintiff alleged that Defendants Cunningham, Esparza, Fritcher, Hairell, and Robertson breached their fiduciary obligations by failing to discharge their duties with respect to the ESOP solely in the interest of its participants and with the proper care in violation of section 404(a)(1)(A) and (B) of ERISA, 29 U.S.C. 1104(a)(1)(A) and (B) by:

1. failing to follow the procedures necessary to determine the fair market value of the shares of MCS sold to the ESOP and

2. causing the ESOP to pay defendant Cunningham more than adequate consideration for the purchase of the shares.

Section 404(a)(1) of ERISA 29 U.S.C. 1104(a)(1) provides in pertinent part that:

... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

A. for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

B. with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Plaintiff also alleged that Defendants Cunningham, Esparza, Fritcher, Hairell, and Robertson failed to discharge their fiduciary duties in accordance with the documents of the ESOP in violation of section 404(a)(1)(D) of ERISA, 29 U.S.C. 1104(a)(1)(D).

Plaintiff further alleged that Defendants Cunningham, Esparza, Fritcher, Hairell, and Robertson caused the ESOP to engage in transactions which constituted sales of property between the ESOP and a party in interest in violation of section 406(a)(1)(A) of ERISA, 29 U.S.C. 1106(a)(1)(A) and which constituted transfers of the ESOP assets to a party in interest in violation of section 406(a)(1)(D) of ERISA, 29 U.S.C. 1106(a)(1)(D) by causing the ESOP to purchase the MCS stock from Defendant Cunningham for more than adequate consideration. Section 406(a)(1) of ERISA, 29 U.S.C.

2. Section 502(g)(1) of ERISA, 29 U.S.C. 1132(g)(1) provides in pertinent part:

In any action under this subchapter ... by a participant, beneficiary or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

3. 28 U.S.C. 2412(d)(1)(A) provides in pertinent part:

... a court shall award to a prevailing party ... fees and other expenses ... incurred by that party in any civil action brought by or against the United States ... unless the court finds that the position of the United States was substantially justified or that spe-

cial circumstances make an award of fees unjust.

4. 28 U.S.C. 2412(a) provides in pertinent part:

... a judgment for costs, ... but not including the fees and expenses of attorney's, may be awarded to the prevailing party in any civil action brought by or against the United States ...

28 U.S.C. 2412(b) provides in pertinent part:

... a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States ...

1106(a)(1), entitled "Prohibited transactions," provides in pertinent part that;

> ... a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or]
>
> B)–C) ...
>
> D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan ...

Plaintiff further alleged that Defendant Cunningham dealt with the assets in his own interest or for his own account in violation of section 406(b)(1) of ERISA, 29 U.S.C. 1106(b)(1), and acted on behalf of a party whose interests are adverse to the interests of the Plan or the interests of its participants or beneficiaries in violation of section 406(b)(2) of ERISA, 29 U.S.C. 1106(b)(2) by his participation in causing the ESOP to purchase the MCS stock from him for more than adequate consideration.[5]

Finally Plaintiff alleged that Defendants Carter and Perrin are liable pursuant to section 405(a)(1) and (3) of ERISA, 29 U.S.C. 1105(a)(1) and (3) for breaches committed by the other defendants.

Section 405(a) of ERISA, 29 U.S.C. 1105(a) provides, in pertinent part, that;

> .... a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> 1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> 2) ...
>
> 3) if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

The cause was tried to the bench for six days beginning December 16, 1981. Based upon the evidence adduced at trial, including depositions cited to the court by plaintiff, and upon a thorough review of the file along with relevant precedent, this court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Metropolitan Contract Services, Inc. (MCS) is a contract trucking company which, at all times relevant to this action, has provided delivery services for department stores in the southern and western parts of the country. The business was started in 1964 by Defendant Kenneth R. Cunningham and was subsequently sold to a separate corporation called Illustrated World Encyclopedia, Inc. In May, 1973 Defendant Cunningham repurchased the assets of MCS for approximately $500,000. By the close of the fiscal year ended June 30, 1974, the company's business primarily entailed bulk deliveries of retail merchandise such as furniture, appliances and other goods too large to be delivered as packages by a common carrier. The bulk deliveries typically were made from department stores, where the goods were purchased, to the consumers who purchased those goods. The deliveries were made pursuant to contracts between the department stores and MCS.

As of June 30, 1975, Defendant Cunningham was chairman of the board, chief executive officer, president, and sole shareholder of MCS. Defendant Fritcher was secretary/treasurer and comptroller of MCS; Defendants Hairell and Robertson were vice presidents; and Defendant Perrin was counsel to MCS. In 1975, 1976, and 1977, Defendants Cunningham, Esparza, Fritcher, Hairell, and Robertson were also members of the MCS board of directors. In late 1976 or early 1977, Defendant Carter became comptroller of MCS.

---

**5.** The prohibitions of section 406 of ERISA, 29 U.S.C. 1106 do not apply to certain transactions where the consideration paid is not more than adequate. Section 408(e)(1) of ERISA, 29 U.S.C. 1108(e)(1).

From 1972 until mid-1977, Defendant Cunningham was sole shareholder of a separate company called Metro Contract Services, Inc. (Metro). Metro provided logistical support to government facilities, pursuant to cost plus contracts. Those contracts were generally for three year terms and were governed by applicable federal law, including the Service Contract Act and various procurement regulations. As of December 31, 1976, Cunningham was chairman of the board and chief executive officer of Metro; Esparza was president and chief operating officer, and Fritcher was secretary, treasurer, and chief financial officer.

Although, after 1975, other shareholders (including the ESOP) obtained shares in the company, MCS has never issued a dividend.

On December 15, 1975 (effective July 1, 1975), the Board of Directors of MCS voted to establish an employee stock ownership plan "in order to enable participating employees of the corporation to share in the growth and prosperity of the company and to provide the participants with an opportunity to accumulate additional resources for their retirement." Unanimous Consent of Directors, Dec. 15, 1975.

In deciding to establish the ESOP, defendants (in their capacity as directors of MCS) consulted with and received advice from a number of professionals. Those professionals included private consultants, attorneys, and accountants.

In establishing the ESOP Defendant Cunningham intended to sell 100% of his Metropolitan stock to the ESOP, over some period of time. While there was no written document setting forth any such intent or obligating Cunningham to execute this stated intent or requiring sale of all the stock over any particular period of time, the testimony of the various committee members established that 100% of the MCS stock would be transferred to the ESOP as quickly as it could be done in an orderly, undisruptive, and efficient fashion. The source of funds for the purchase of the stock was MCS contributions to the ESOP. Therefore the profitability of MCS operations would primarily determine the period over which the full purchase of MCS stock would occur.

Cunningham's credible testimony that he intended the expeditious sale of 100% of MCS to the ESOP is corroborated by the fact that he had sold the predecessor to MCS to Illustrated World Encyclopedia, Inc. in 1971 and after the repurchase in 1973 had solicited bids for a sale of MCS more recently, prior to creation of the MCS ESOP.

In August of 1975, the investment banking firm of Rotan Mosle, Inc. was hired by MCS to appraise the fair market value of the 100% block of MCS stock owned by Defendant Cunningham, as of June 30, 1975. Rotan Mosle has substantial expertise in stock evaluations of all types and may be considered neutral on the evaluation of the MCS shares. Rotan Mosle estimated the fair market value of that 100% at $2,020,000. or $200 per share, based on 10,100 shares outstanding (all owned by Defendant Cunningham). The appraisal was issued in November 1975. Plaintiff's expert, Mr. Paul Much, agreed that the Rotan Mosle evaluation was accurate for a 100% block as of June, 1975.

Rotan Mosle's valuation was in part premised on management's projection, as of June 30, 1975, that gross revenues for the coming fiscal year would be $6.5 million. The $6.5 million projection was reached by adding several components: (a) actual revenues of $4.2 million for the year ended June 30, 1975, plus (b) addition of 3 to 4 new contracts, plus (c) 10–15% increase in current revenues due primarily to inflation.

On August 6, 1976, defendants in their capacity as the Board of Directors, voted to contribute some $288,000 to the ESOP for the purpose of enabling the ESOP to purchase 1,440 shares of MCS stock from Defendant Cunningham. On that same day the Administrative Committee, excluding Cunningham, voted to purchase those shares at $200 each, for a total payment of $288,000 in cash. On or about August 11, 1976, the sale and purchase actually occurred. The block of 1,440 shares comprised about 14% of the total outstanding shares at that time (10,100).

Defendants based their decision to pay $200 per share on the June, 1975 Rotan Mosle appraisal and upon their individual assessment of the company's financial condition and prospects. By August, 1976 when the shares were sold to the ESOP, MCS's actual revenues for the fiscal year ended June 30, 1976 were below the projected revenues assumed in the Rotan Mosle appraisal. However, each defendant who testified stated that he fully expected certain large contracts to come on stream soon after that time and that the difficulties which the company experienced in fiscal year ending June 30, 1976 would be overcome. Subsequent events proved their foresight correct.

On February 9, 1977, just prior to the second sale of stock to the ESOP, MCS issued an additional number of shares to Cunningham and, in exchange, acquired from him all outstanding shares of Metro.

The exchange of stock was accomplished in the following manner: On January 3, 1977, the directors of MCS, including Cunningham, authorized the company to issue an additional 9,000 shares of stock (bringing the total outstanding to 19,100), and further authorized distribution of all 9,000 shares to Cunningham. In exchange for these 9,000 shares, Cunningham transferred to MCS all of the 25,000 outstanding shares of Metro. As noted above, Cunningham was sole owner of all Metro shares. As stated in the minutes of the directors' meeting of January 3, 1977, it was the intention of the Board that the exchange of stock would qualify as a tax-free reorganization under the Internal Revenue Code, and that as a result of the exchange, Metro would become a wholly owned subsidiary of MCS, i.e., MCS would own all shares of Metro.

Sometime prior to January 3, 1977, Cunningham had a telephone conversation with Robert Moroney, an appraiser at Rotan Mosle, in which the two men discussed the fair market value of the 25,000 share of Metro.

Mr. Moroney informed Cunningham that in his opinion, the value of 100% of Metro was $1.8 million as of December 31, 1976. Mr. Moroney later confirmed that telephone conversation by letter. It is a significant fact that just prior to the second sale of MCS stock to the ESOP Cunningham transferred 100% of Metro valued at $1.8 million for 9000 shares of MCS.[6]

On February 18, 1977, upon the vote of the Administrative Committee, excluding Cunningham, the ESOP purchased an additional 5,000 shares from Cunningham, at $200 per share, for a total of $1 million.

Defendants relied on the Rotan Mosle appraisal, and upon their individual assessments of the company and their prognoses as the basis for determining that that purchase was for adequate consideration. By February 1977, the number of outstanding shares of MCS stock had increased to 19,100 so the 5,000 shares sold to the ESOP comprised a minority block (of approximately 26%). After the sale, the ESOP owned a total of 6,400 shares, or roughly 34% of the outstanding shares, and Cunningham owned 12,660 or some 66%.

This second ESOP transaction was financed through a $1 million loan to the ESOP from Allied Bank. The promissory note to Allied for this $1 million loan, payable by the ESOP, required payment of $200,000 annually over a maximum term of five years, at an interest rate of a half point over prime. In connection with the loan, MCS agreed to make sufficient contributions to the ESOP to enable it to meet its payments to the Bank. The loan was actually repaid in under one year through contributions by MCS.

There is no evidence that defendants Perrin and Carter knowingly participated in or sought to conceal any acts of the other defendants which acts plaintiff alleges were breaches of the defendants' fiduciary re-

---

**6.** Kenneth Cunningham, in his deposition at page 200, stated that he believed he relied on the Metro appraisal in deciding on the $200 per share price for the MCS stock. While the exchange of the Metro stock for MCS stock does not alone establish a price for MCS stock it does bear directly and positively on defendants' good faith in the transaction between Cunningham and the ESOP.

sponsibilities to the plan participants and beneficiaries.

### FINDINGS OF FACT RELATING TO EVALUATION OF MCS STOCK SOLD TO ESOP

■ Evaluation of the stock of a closely held corporation is an inexact endeavor. The statutory prescription for ascertaining adequate consideration is found in section 3(18)(B) of ERISA, 29 U.S.C. 1002(18)(B). Under this section fair market value must be determined in good faith pursuant to the terms of the Plan. The Plan in this case provides for procedure identical to that found in section 3(18)(B) of ERISA, 29 U.S.C. 1002(18)(B) except that, additionally, any interested party shall not participate in the vote or decision concerning a transaction in which he is interested. The section further provides that value is to be determined in accordance with regulations promulgated by the Secretary of the Department of Labor. The Secretary has not promulgated regulations for ascertaining the fair market value of a security for which there is no generally recognized market, therefore, evaluation must be undertaken in good faith without the guidance of formalized procedure specifically established for ERISA. This court interprets good faith to entail not only the sole motivation of benefiting the ESOP but also the application of sound business principles of evaluation.

■ The court has reviewed numerous procedures for comprehensive evaluation of stock, in a closely held corporation.[7] These procedures provide a suitable point of departure in valuing the stock intended for transfer to an employee stock ownership plan. However, the unique circumstances of a transfer of shares to an employee benefit plan require divergence from usual evaluation techniques. In a stock transfer to a benefit plan, the particular economic and legal relationship between the buyer and seller, the goals of shifting ownership to

employees, and the need for reasonable valuation techniques which are fair and which do not inhibit establishment of such benefit plans are all factors which weigh uniquely upon valuation.

■ One figure agreed upon by both sides to the lawsuit is $200.00 per share as of November 1975, which value was suggested in the Rotan Mosle appraisal of November 1975 for a 100% block of the MCS stock. The plaintiff's expert, Mr. Paul Much, considers a substantial discount from this $200.00 figure to be necessitated by the fact that the interest transferred would be a minority share and thus subject to manipulation and exploitation by the control block owner. Minority ownership may carry an implicit discount in an arms length third party sale, however this court considers the financial considerations which obtain to such a third party sale to be largely inapplicable to these sales to the MCS ESOP. Minority ownership can certainly justify discount of shares in the possession of an ESOP, however the MCS ESOP is distinct. As noted above the court finds that the Administrative Committee intended to purchase for the ESOP, and Cunningham intended to sell to the ESOP, 100% of the MCS stock. This intent to transfer the full ownership to the ESOP within a relatively short period greatly attenuates the disparity in stock value which would exist if the transfer were between Cunningham, as controlling shareholder, and an independent third party.

Further there is no evidence of the exploitation of corporate perquisites which is a frequent attribute of control ownership. Neither the salary commanded by Cunningham or his associate Mr. Tomlinson nor the payments to another Cunningham corporation, Jet Travel, Inc. may be characterized as excessive use or diversion of corporate funds.

The court further finds that there is no evidence that Defendant Cunningham in-

---

7. See generally 26 C.F.R. 20.2031–2(f)(2), Maher, *An Objective Measurement For a Discount For a Minority Interest and a Premium For a Controlling Interest,* 47 Taxes 449 (1979), Maroney, *Why 25% Discount For Non-Marketability in One Valuation,* 100% *in Another,* 55 Taxes 316 (1977).

fluenced or attempted to influence the other members of the Administrative Committee in the evaluation or purchase of Cunningham's MCS stock.

▬ Mr. Much argues that control ownership carries with it the privilege of making unfettered important corporate decisions. However this is a control ownership prerogative only among independent parties. Where an individual, who is in a corporate decision making position, is also a fiduciary to an employee benefit plan, it is clear under the law of ERISA that that fiduciary may not discharge his corporate management role without full consideration of and respect for the interests of the beneficiaries of the plan. *N. L. R. B. v. Amax Coal Co.*, 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941), *Donovan v. Bierwirth, et al*, 538 F.Supp. 463 (E.D.N.Y.) December 3, 1981. Therefore, the usual power accorded control ownership is substantially circumscribed by the legal obligation which the control owner owes to the plan beneficiaries and accordingly any discount which could be generally applicable because of such control will be greatly reduced or eliminated in a situation involving a transfer of stock to a plan by a fiduciary of the plan.

▬ Additionally, Mr. Much places great emphasis, in reaching his conclusion on the fair market value of the MCS stock, on the size of the blocks transferred and on the marketability of those blocks. Mr. Much suggests that as of June 30, 1975 a comparable publicly held stock would be valued at $124.00 per share and a privately held stock would be valued at $80.00 per share while stock in an ESOP with a discretionary put would be $105.00 per share. With these figures as starting points Mr. Much goes on to find values of $71.00 and $88.00 per share for August 1976 and February 1977 respectively.[8] This estimate of

8. This court disagrees fundamentally with Mr. Much's apparent stance that valuation for ESOP purposes mirrors that for other purposes except in ways which require a greater discount for an ESOP valuation. See Valuation Report p. 4 where Mr. Much states that the additional labor costs and financing arrangements should be considered. Certainly these considerations are relevant, however the unique attributes of ESOP purchase and ownership militate against the most substantial of Mr. Much's arguments for significant discounts in this valuation. Mr. Much arrives at the 1976 and 1977 values through an analysis of:

1) The company's actual sales and earnings for the fiscal year ending June 30, 1976 as compared with management's projection for that period;
2) MCS future outlook as of the respective dates of the transfers of MCS shares to the ESOP;
3) MCS operating performance relative to those of five comparable public companies;
4) the lack of marketability of a minority position in MCS as a private company.

[Plaintiff's exhibit 68A, Valuation Report, pages 15 and 22.] Mr. Much, in reaching the values for MCS stock for 1976 and 1977 stresses the fact that projected sales and earnings failed to materialize. Mr. Much conceded that the lower sales and earnings figures resulted in part from the failure to gain three anticipated contracts and from time lags associated with bringing on new customer contracts that ultimately were obtained. He further suggests that the failure of MCS to achieve any net gains between 1975 and 1976 would result in investor skepticism towards projections for subsequent years. Therefore the "attractiveness of an investment in Metropolitan would decrease with a resultant negative valuation impact". Valuation Report, p. 17. This argument is flawed. An argument central to the government's case is that the diminished actual sales and earnings for 1976 justified a significant discount. The government's expert concedes that new contracts projected for 1976, but unrealized, would likely develop in fiscal 1977 (and the court has determined that the defendants were reasonable in reliance on the anticipated contracts). Notwithstanding the actual financial condition of MCS, Mr. Much maintains that because it failed to meet its projections for 1976 investors would be unwilling to accept the new revenue and earnings prospects.

In a stock transfer to this ESOP, this position is not sustainable. Reference to an independent, third party sale provides only a backdrop for valuation in a sale to the ESOP. In a bargaining context, the tensions of the marketplace might permit an independent purchaser to discount such information about new contracts. However, this is an essential point where ESOP valuation procedure and non-ESOP valuation procedure diverge. The agents of the purchaser here were the persons who generated the new contracts. They, uniquely, were aware of the implication of these con-

the stock's value in the hands of the ESOP is completely arbitrary and unreliable in view of Mr. Much's obvious prejudice in favor of attaining a valuation which supports the theory of the Department of Labor. In view of the certain intent to transfer all the MCS stock over a short period, the marketability difficulties a minority block might experience generally, are not present. In this regard, though neither MCS nor the ESOP was obligated to repurchase shares of MCS received by employees from the ESOP, there is an indication that the company would purchase the shares when they were distributed to employees and had done so on the infrequent occasion when an employee requested.[9]

■ Evaluating the totality of the evidence and the credibility of the witnesses, particularly Mr. Cunningham and the other members of the Board of Directors and Administrative Committee of MCS, it is the opinion of this court, that each defendant conducted himself in good faith with dedi-

cation to the ESOP participants and beneficiaries.

■ The viability of a service corporation of this size usually depends upon the business acumen of its management team. The members of the management team are generally in the most advantageous position to estimate a company's potential. When their estimation is undertaken in good faith, the resulting opinion of value carries great weight. Each defendant who testified indicated that in arriving at a value for the stock he considered the company's prospects as he saw them at the time of the evaluation. While the court must evaluate the fiduciaries' prudence at the time of the inquiry into the stock value, it is certainly relevant to the reasonableness of the determination of the fair market value that the individual prognoses of the company's imminent prosperity proved to be accurate. Therefore the shortfall in revenues from that projected in the Rotan Mosle appraisal for the year of the stock transactions does not, in view of the counterposing assess-

tracts to MCS's financial picture. It is understood that these contracts would largely rectify the financial difficulties experienced in fiscal 1976. Investor skepticism therefore, in this case cannot be reasonably considered to be such a factor.

Further Mr. Much, in his written valuation report at p. 2 stated that a control shareholder may "dictate management policy, determine levels of compensation, set dividend policies according to personal preference, and force the sale of the entire company" which powers justify a premium for such ownership. The court specifically finds that no exploitation of control prerogative did in fact occur and further notes that, under the law of ERISA (as discussed in the body of this opinion at p. 285), in fact the control owner, where such owner is also a fiduciary as here, does not possess these unfettered powers. If a control owner/fiduciary does act in a manner which detriments the participants and beneficiaries of the ESOP, he may breach the standards of care imposed by ERISA, section 404, 29 U.S.C. 1104. However, the existence of these comprehensive statutory standards to weigh the actions of a control owner/fiduciary raises entirely different implications for valuation for ESOP purposes than would apply in a sale between a control owner and an independent third party.

A control owner's exercise of these powers to his sole benefit is not consistent with the discharge of fiduciary duties solely in the interest of the participants and beneficiaries and for the

exclusive purpose of providing benefits to participants and their beneficiaries. The control owner cannot serve two masters. The establishment of an ESOP requires at least equal obeisance to the beneficiaries of the Plan. This statutory proscription effectively invests the Plan and its beneficiaries with a power which substantially counterbalances that of the control owner by virtue of its ownership position. This fact coupled with the certain intent in this case to quickly transfer 100% ownership to the ESOP strongly undermines the argument that a discount in value is mandatory due to minority ownership.

9. Mr. Cunningham so stated in trial and in his deposition at pg. 88. Additionally Mr. Much notes in the Valuation Report at pg. 20, the company had a "probable intent" to repurchase the share distributed and because of this intent Mr. Much lowered the discount applicable due to lack of marketability. However Mr. Much then determined that due to the company's 1976 earnings decline that the discount should be increased to 20% because the company's ability to repurchase was reduced. The determination of appropriate discount is largely a subjective undertaking. In view of the courts finding that Mr. Much acted with obvious bias towards supporting the theory of the Department of Labor these valuation determinations are not persuasive.

ment of company growth by the management team, necessitate, as a matter of common business sense, a discount in stock value. The plaintiff's argument in this regard, as the court sees it, is that the dip in revenues from that projected, coupled with the minority block transfer, should have signaled a reasonably prudent person to not rely on the Rotan Mosle appraisal. However, without an arm's length sale fair market value of a closely held corporation's stock cannot be ascertained with any degree of certainty. The court accepts the Rotan Mosle appraisal as the most certain approximation of the fair market value which can be obtained. Further, the court holds, in light of the foregoing discussion, that that appraisal remained a reasonable approximation of the value of the stock transferred to the ESOP in August of 1976 and February of 1977.

## CONCLUSIONS OF LAW

This court has jurisdiction of this cause under section 502(e)(1) of ERISA, 29 U.S.C. 1132(e)(1). Venue is proper under section 502(e)(2) of ERISA, 29 U.S.C. 1132(e)(2).

The Secretary of Labor has the authority to bring this action under section 502(a)(2) and (5) of ERISA, 29 U.S.C. 1132(a)(2) and (5).

The MCS ESOP is an employee pension benefit plan within the meaning of section 3(2) of ERISA, 29 U.S.C. 1002(2). MCS is a corporation engaged in interstate commerce. Section 4(a)(1) of ERISA 29 U.S.C. 1003(a)(1).

Each of the primary defendants is a fiduciary within the meaning of section 3(21)(A) of ERISA, 29 U.S.C. 1002(21)(A) and Defendant Cunningham is a party in interest with respect to the ESOP within the meaning of section 3(14)(A) of ERISA 29 U.S.C. 1002(14)(A).

 The Employee Retirement Income Security Act was designed to "prevent transactions which would dissipate or endanger plan assets; and to provide effective remedies for breaches of trust." U.S. Code Cong. and Admin.News pp. 4939, 5186, 93d Cong. 2d Sess., 1974. Applying the facts found above to the law of ERISA, the court concludes that reliance on the Rotan Mosle appraisal of June, 1975 coupled with the independent assessment of the company's potential was reasonable and prudent for individuals in the position of these members of the Administrative Committee of the MCS ESOP. Further because defendants acted in good faith and because Mr. Cunningham did not participate in the vote or decision concerning the purchase by the ESOP of the MCS stock, the two stock transactions were accomplished in compliance with the general procedure prescribed in ERISA § 3(18)(B), 29 U.S.C. 1002(18)(B) and the documents and instruments governing the plan. Section 404(a)(1)(D) of ERISA, 29 U.S.C. 1104(a)(1)(D). Where the procedure utilized was in compliance with that delineated in the statute and the Plan and where the consideration paid was not in excess of adequate consideration, one cannot but conclude that each defendant as fiduciary discharged his duties in the interest of the plan beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries with the care, skill, prudence and diligence required, in compliance with section 404(a)(1)(A) and (B) of ERISA, 29 U.S.C. 1104(a)(1) and (B).[10]

The general fiduciary obligations of section 404 of ERISA, 29 U.S.C. 1104, are supplemented by specific prohibitions of section 406 of ERISA, 29 U.S.C. 1106, which Congress enacted to prevent categories of transactions which offer a high potential for insider abuse of plans or loss of plan assets. *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 637 (W.D.Wis.1979), *Marshall v. Kelly*, 465 F.Supp. 341 (W.D.Okl. 1978).

 While Congress intended through the enactment of section 406 of ERISA, 29 U.S.C. 1106, to prevent certain transactions

**10.** See generally Hutchinson, *The Federal Prudent Man Rule Under ERISA*, 22 V. II. L.Rev. 15 (1976).

which have a high potential for detriment to an employee plan, a transaction of the sort which occurred in this case (the purchase of qualifying employer securities) is not prohibited if the acquisition was for adequate consideration. Section 408(e)(1) of ERISA, 29 U.S.C. 1108(e)(1).

▮ Defendants have the burden of proving that the consideration paid for the stock by the ESOP was not more than adequate consideration where exemption is sought pursuant to section 408(e)(1) of ERISA, 29 U.S.C. 1108(e)(1) from the prohibitions against dealing with a party in interest. The court determines that the defendants have met this burden.[11]

Because the stock was sold to the ESOP for no more than adequate consideration, the exception of section 408(e)(1) of ERISA, 29 U.S.C. 1108(e)(1) is present and the prohibitions imposed in section 406(a) and (b) of ERISA, 29 U.S.C. 1106(a) and (b), against dealings with a party in interest, are inapplicable. Therefore, no defendant engaged in an unexcepted prohibited transaction within meaning of section 406 of ERISA, 29 U.S.C. 1106.

The court has specifically found that no defendant breached his fiduciary responsibility imposed by ERISA and by the plan documents. Accordingly, Defendants Perrin and Carter did not violate section 405(a)(1) and (3) of ERISA, 29 U.S.C. 1105(a)(1) and (3).

The court concludes as a matter of law that the third-party actions, cross-actions and counterclaims brought by defendants Esparza, Fritcher, Perrin and Carter against Cunningham and MCS should be dismissed in view of the court's findings on the merits of this case. The court's findings on the merits renders moot the various third-party actions, cross actions and counterclaims brought by these primary defend-ants for indemnity in the event of a determination of liability under ERISA in the dominant suit. Defendants/counter-plaintiffs in these actions also seek attorney's fees and costs against Cunningham or MCS. In light of this court's ruling on the application for fees and costs against the Department of Labor the court will reserve ruling on these claims for fees and costs against Cunningham or MCS.

Additionally, the third party actions against Allied brought by defendant Cunningham, Hairell and Robertson in one instance and defendants Perrin and Carter in another instance shall be dismissed in view of the court's findings on the merits of this case. Allied's counterclaim and third-party claims for indemnity are also moot except for the claim for its attorney's fees and expenses pursuant to the indemnity agreements and its request for fees and expenses pursuant to section 502(g) of ERISA, 29 U.S.C. 1132(g).

## ATTORNEY'S FEES

### A. Applications by Primary Defendants

[16] The court finds that the primary defendants should be granted their attorneys' fees, costs and other expenses pursuant to 28 U.S.C. 2412(a) and (b). The court will enter judgment for costs against the plaintiff for defendants pursuant to 28 U.S.C. 2412(a). The court will enter judgment for reasonable attorneys' fees and expenses for defendants against the plaintiff pursuant to 28 U.S.C. 2412(b). Though 28 U.S.C. 2412(a) and (b) accord discretion to the court in awarding attorney's fees, it is appropriate to delineate the bases for the determination that defendants should receive their expenses and fees. See *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255 (5th Cir. 1980) (involving similar discretion under 29 U.S.C. 1132(g)).

---

11. Defendants have met this burden primarily through their credible testimony that significant contracts were imminent at the time of the sale to the ESOP and through the Rotan Mosle appraisal of June, 1975. Defendants also have presented the expert testimony of Mr. Allan Graber in support of the $200.00 per share value for August 1976 and February 1977. Mr. Graber's testimony is some evidence of the $200.00 figure, but the court has discounted the probative value of his testimony because it is apparent that his primary experience is not in evaluation of entities of this nature.

The defendants individually and MCS suffered a devastating attack by the Department of Labor (DOL) in the bringing of this suit. Upon hearing the evidence presented by the DOL it is clear that this case could have been avoided if the DOL had taken a more objective look at the facts which were or could have been at their disposal. This court is further of the opinion that for whatever reason, which is not readily apparent, the case became a cause celebre in the eyes of the DOL and its attorneys. For example, the manner in which the services of Mr. Much were obtained, his apparent effort to build a case and the combative atmosphere of the pretrial period and trial to the court are significant indications of the motivations beyond that which may be reasonably expected in a suit to obtain compliance with the provisions of ERISA. The award of fees and expenses is appropriate not only because the DOL is able to satisfy the award or because the suit was largely unjustified, but also because this award might, to some degree, cause the DOL to take a more objective approach before instituting suits which have such significant adverse impact upon the lives of a relatively small but successful business and on the lives of hardworking individuals whose industry has resulted in gain for themselves and their employees.

The court further finds that Defendants Hairell, Carter, Perrin, Robertson, Esparza and Fritcher qualify for recovery of their reasonable attorneys' fees pursuant to 28 U.S.C. 2412(d)(1)(A), because these defendants were parties as defined in 28 U.S.C. 2412(d)(2)(B), and the position of the United States was not substantially justified. Judgment for fees and costs for all primary defendants will be entered accordingly.

#### B. *Application by Allied*

The court has determined that the indemnity agreement contained in the Plan section 17G is void under section 410 of ERISA, 29 U.S.C. 1110. Allied argues persuasively that section 1110 of Title 29 does not apply to the indemnification agreement as to Allied because in this agreement MCS would be called upon to indemnify Allied and in such situation the agreements do not undermine the responsibilities imposed on Allied as directed trustee.

The Department of Labor issued an interpretive bulletin June 4, 1975 which is contained within 29 C.F.R. 2509.75–4. 29 C.F.R. 2509.75–4 provides in pertinent part:

> The Department of Labor interprets this section (29 U.S.C. 1110(a)) to permit indemnification agreements which do not relieve a fiduciary of responsibility or liability under Part 4 of Title I. Indemnification provisions which leave the fiduciary fully responsible and liable, but merely permit another party to satisfy any liability incurred by the fiduciary in the same manner as insurance purchased under section 410(b)(3), are therefore not void under section 410(a).... The Department of Labor interprets section 410(a) as rendering void any arrangement for indemnification of a fiduciary of an employee benefit plan by the plan. Such result would have the same result as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by abrogating the plans right to recovery from the fiduciary for breaches of fiduciary obligations...

In the instant case, of course, the ESOP owns a substantial portion of MCS stock. It is inconsonant with the intentions of section 410 of ERISA, 29 U.S.C. 1110, and the regulations quoted above, to permit indemnification by MCS where the ESOP would indirectly bear the financial burden. Such situation is not a mere shifting of liability incurred by a fiduciary in the same manner as insurance. Further that there is no adjudication of Allied's status as fiduciary does not affect the court's ruling on this question. The goal is to protect the ESOP from suffering any expense of this suit— that goal cannot be met by requiring MCS to indemnify any part to this suit. Similarly, the two letter agreements of August 1976 and February 1977 executed by the Administrative Committee may not be given affect under section 410 of ERISA, 29 U.S.C. 1110.

The court will not rule on the enforceability of the indemnity agreement of February 18, 1977 executed in favor of Allied by Kenneth R. Cunningham in view of this court's determination that fees and costs should be available under section 502(g)(1) of ERISA 29 U.S.C. 1132(g)(1). This award under section 1132(g)(1) will be against Defendant Cunningham alone. The court has determined that the award is appropriate in such form because the third party actions against Allied were unfounded and were designed it appears only to secure Allied's presence in the suit to aid in defense of the primary suit. Further, Cunningham is in the financial position to satisfy the award of fees and costs while the other defendants are not.

■ The statutory construction of ERISA makes clear that the responsibility of Allied as directed trustee is not equal to that of primary fiduciaries. Section 403(a)(1) of ERISA, 29 U.S.C. 1103(a)(1) provides that a trustee such as Allied is to follow the "proper directions" of a named fiduciary which directions are made in accordance with the terms of the plan and which are not contrary to ERISA. This court, while acknowledging differentiation in standards of care implied by section 1103, carried Allied's motion for summary judgment through the trial because the reach of ERISA to entities performing services for the ESOP is quite long. Notwithstanding the limited role prescribed by section 1103, the trustees actual exercise of authority or control could raise the fiduciary responsibility required of such trustee. Section 3(21)(A) of ERISA, 29 U.S.C. 1002(21)(A). However, it became apparent upon hearing the evidence at trial and upon a review of the depositions of the various principals, that Allied at all times remained within the limited role of directed trustee. Award of its costs and fees is therefore appropriate.

The fees and costs allowed pursuant to this order will be determined at hearing.

Accordingly it is hereby ORDERED, ADJUDGED, and DECREED:

(1) That the Department of Labor's claims brought under sections 404 and 406 of ERISA, 29 U.S.C. 1104, 1106 against Defendants Cunningham, Esparza, Fritcher, Hairell, and Robertson be and same are DISMISSED with prejudice and that judgment be entered for these defendants.

(2) That the Department of Labor's claim against Defendants Perrin and Carter under section 405 of ERISA, 29 U.S.C. 1105 be and same is DISMISSED with prejudice and that judgment be entered for these defendants.

(3) That the third party actions, cross-actions and counterclaims brought by Defendants Esparza, Fritcher, Perrin, and Carter, against Defendant Cunningham and Metropolitan Contract Services, Inc., be and same are DISMISSED.

(4) That the third party actions against Allied Bank of Texas brought by Defendants Cunningham, Hairell, Robertson, Perrin, and Carter be and same are DISMISSED.

(5) That the counterclaim and third party claims of Allied Bank of Texas against Metropolitan Contract Services, Inc., the Metropolitan Contract Services, Inc., Employee Stock Ownership Plan, Cunningham, Hairell, Robertson, Perrin, and Carter be and same are DISMISSED save and except Allied's application for attorney's fees and costs against Cunningham pursuant to section 502(g)(1) of ERISA, 29 U.S.C. 1132(g)(1).

(6) That Defendants Cunningham, Esparza, Fritcher, Hairell, Robertson, Perrin, and Carter shall have their costs and attorneys' fees incurred in this action pursuant to 28 U.S.C. 2412(a) and (b).

(7) In the alternative, that Defendants Esparza, Fritcher, Hairell, Robertson, Perrin, and Carter shall have their costs and attorneys' fees from the Department of Labor, pursuant to 28 U.S.C. 2412(d)(1)(A).

(8) That Allied Bank of Texas as counter-plaintiff and third-party plaintiff shall recover from Cunningham, its attorneys' fees and costs incurred against Cunningham pursuant to section 503(g)(1) of ERISA, 29 U.S.C. 1132(g)(1).