**Charles W. LEIGH and Ervin F. Dusek, Plaintiffs,**

**George Johnson, Eleanor Madsen, et al., Intervening Plaintiffs,**

v.

**Clyde Wm. ENGLE, Nathan Dardick, Ronald Zuckerman, Libco Corporation, Telco Marketing Services, Telvest, National Boulevard Bank, and the Reliable Employees' Profit Sharing Plan Trust, Defendants.**

**No. 78 C 3799.**

United States District Court, N.D. Illinois, E.D.

June 27, 1985.

Ware Adams, Chicago, Ill., for plaintiffs.

Sachnoff, Weaver & Rubinstein, Chicago, Ill., for defendants.

Richard Moenning, Chicago, Ill., for intervening plaintiffs.

### MEMORANDUM AND ORDER

MORAN, District Judge.

After an extended bench trial Judge Leighton entered 23 pages of findings of fact and conclusions of law on November 18, 1982. Upon appeal, the Court of Appeals issued a 28-page modified opinion in March 1984. *See Leigh v. Engle*, 727 F.2d 113 (7th Cir.1984). That opinion affirmed in some respects, reversed in others, and vacated and remanded for further proceedings, with costs to be borne equally by the parties. Upon the commencement of those further proceedings before this court we requested the assistance of the parties in fashioning a damages measure. That assistance was not forthcoming in any meaningful way, and this court detailed its concerns in October 1984 and again asked for assistance. Again the parties have been of little help, apparently not one of them seem to be able to accept what this court has accepted as the mandate from the Court of Appeals. Indeed, the most recent effort has been that of the intervenors seeking clarification from the Court of Appeals.

The intervenor asked the Court of Appeals to "clarify" its opinion by adopting the intervenors' position on damages, a position this court believed the appellate decision had clearly rejected. The Court of Appeals declined. This action's troubled history continues, and it obviously is not going to end unless this court delineates the issues as we see them and, to the extent it can do so without further "assistance," acts upon them.

The principal battle is over what recovery there may be from liable fiduciaries because of their involvement in three investments. Two defendants have been found liable for damages, if any. Whether two other defendants are liable remains a factual dispute to be resolved after an evidentiary hearing.

A second area of contention relates to a reserve fund. The Court of Appeals directed this court to consider "at the first opportunity the desirability of an immediate distribution of all remaining assets . . . ." The remaining assets in hand, however, are approximately $80,000, less than 10 per cent of the distribution long since made, and the plaintiffs and intervenors have made it abundantly clear that the remaining assets from their perspective are closer to $250,-000 to $300,000, after the return of attorneys' fees and expenses to the fund. But that perception raises legal and factual questions which need to be addressed, which will be addressed herein, and which have been virtually ignored or, in this court's view, erroneously perceived by the parties.

The third major area of dispute is whether distribution was improperly delayed; whether, if so, any damage resulted; and, if so, which of the defendants are liable for those damages and to what extent. There are, as well, other issues which have been less central to the disputes.

## I. Reserve Fund

We turn, first, to the reserve fund issues. No one disputes that some of the $80,000 can be distributed. Plaintiffs and intervenors contend that the assets vested in the beneficiaries upon termination were thereupon non-forfeitable. Accordingly, even in the absence of a breach of fiduciary obligations or bad faith the Plan thereafter could pay nothing for expenses of whatever nature. Defendants contend that the trust permits a reserve, that such a reserve is necessary to pay ongoing litigation and administration expenses, that it has already been finally determined that any breaches of fiduciary duties were despite their good faith, and that such litigation expenses are therefore reimbursable from the trust pursuant to Sec. 11.1 of the Plan, which indemnifies the fiduciaries from liability for "any act done or admitted to be done in good faith and with reasonable care and prudence," including "all expenses reasonably incurred in its defense." This court believes both positions to be in error.

Termination of the Plan occurred sometime in 1979. Upon termination, pension rights vest, and, as vested rights, are non-forfeitable, as defendants admitted in their September 6, 1979 letter to the Internal Revenue Service. A non-forfeitable pension right is defined as one which is "unconditional, and which is legally enforceable against the Plan." 29 U.S.C. § 1002(19). A non-forfeitable pension right, however, is not necessarily a right to a recipient's percentage of the total fund. In *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), the Supreme Court stated clearly that the amount considered non-forfeitable must be defined by all the provisions of the Plan. "[T]he statutory definition of 'non-forfeitable' assures that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or method for calculating the benefit." Id. at 512, 101 S.Ct. at 1900. The court, in *Alessi*, asked and answered a key question. "[W]hat defines the content of the benefit that, once vested, cannot be forfeited? ERISA leaves this question largely to the private parties creating the Plan." Id. at 511, 101 S.Ct. at 1900. Thus, this court must look to the trust plan to determine what distributions the beneficiaries should receive. The Pen-

sion Plan provisions are determinative respecting reserves, except when they conflict with specific ERISA provisions. *Blackmar v. Lichtenstein*, 603 F.2d 1306, 1309 (8th Cir.1979).

Section 9.2 of the Trust Agreement provides that, before distribution after termination, the trustee "shall first reserve such reasonable amounts as it may deem necessary to provide for the payment of any expenses then or thereafter chargeable to the trust fund." Attorneys' fees have been withheld as chargeable to the trust fund pursuant to Sec. 11.1. Even though the trustees were found to have breached their fiduciary duties, the Seventh Circuit did not overturn Judge Leighton's finding of good faith. *See* 727 F.2d at 124; Finding of Fact 23. We can, therefore, assume good faith has been found and defendants, according to the Plan, may possibly be entitled to be indemnified and reimbursed for any liability assessed or attorneys' fees owed (although it is difficult to square a breach of trust with "reasonable care and prudence").

■ The central question, largely ignored by the parties, is whether such indemnification is allowed under ERISA. Indemnification from liability for breach of fiduciary duty by a trust is not allowed under ERISA. 29 U.S.C. § 1110(a). *See Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Co.*, 713 F.2d 254, 259 (7th Cir.1983). It has also been found that indemnification for attorney's fees, even where liability has not attached, is also not allowed. *See Donovan v. Cunningham*, 541 F.Supp. 276, 289 (S.D.Tex.1982), *modified on other grounds* 716 F.2d 1455 (5th Cir.1983).

Defendants, quite naturally, rest entirely on the Plan language. Their position might have considerable merit if this were a question of indemnification of a corporate director of a commercial enterprise, where such indemnification is often authorized by state statute. Arguably, indemnification might be permissible under the general law of trusts on the ground that the fiduciaries acted in good faith and the investments in

fact benefited the trust. *See generally* G. Bogert, The Law of Trust and Trustees, § 871, n. 83 (2d Ed.1981); *Craven v. Craven*, 407 Ill. 252, 95 N.E.2d 489 (1950). We are dealing here, however, with indemnification of legal expenses of a fiduciary of a trust fund subject to ERISA, when there has been a determination of a breach of fiduciary duty.

In an advisory opinion dated September 9, 1977, the Department of Labor commented on a provision which indemnified trustees for their legal expenses and allowed for payment in advance of the final disposition. The Department found that Sec. 1110(a) did not forbid such advances as long as the fund obtains a written legal opinion from independent legal counsel that, based on review of the relevant facts, the acts in question did not constitute breach of a fiduciary duty. *See* Department of Labor Advisory Opinion, Ref. No. CA–3588(a) (Sept. 9, 1977). This finding indicates that indemnification for legal expenses, after a finding of breach of fiduciary duty, is not allowed and any advances made would have to be returned.

■ Such a result has been reached with regard to the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401 *et seq.* In *Morrissey v. Segal*, 526 F.2d 121 (2d Cir.1975), the court ordered defendants to reimburse the fund for legal fees advanced during an unsuccessful defense to a breach of fiduciary duty claim. The court found that allowing indemnification for fees "would undermine both protection to union members and deterrence of union officials intended by [the Act]." *Id.* at 126. *See McNamara v. Johnston*, 522 F.2d 1157, 1167 (7th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976) (allowing repayment for legal fees only if defendants prevail). The policies underlying the treatment of pension funds under the LMRDA and ERISA are similar and the provisions in 29 U.S.C. §§ 1109 and 1110 seem to confirm Congress' intent to keep legal fee policies the same for both acts as, unlike the general law of trusts, there are no exceptions for liability of a

trustee who, in breaching his trust, acts in good faith and benefits the fund. Accordingly, the court finds that indemnification for legal fees when a breach of trust has been established, though perhaps provided for by the trust agreement, is not allowed under ERISA.

That does not, however, end the matter. Whether or not the fiduciaries will be successful in defending against the unresolved claims has yet to be determined. The advancement of legal expenses to them for defense against those claims, as the Department of Labor advisory opinion indicates, is an entirely different matter from the question of ultimate liability for legal expenses. *And see Central States, Southeast and Southwest Areas Pension Plan Fund v. American National Bank and Trust Co.*, No. 77 C 4335, slip op. at 6 (N.D.Ill.1979). That issue has not been addressed by the parties. Whether or not an advancement is proper, however, an initial and continuing reserve for reimbursement in the event of exoneration was and remains proper. To the extent that funds have been or will be necessary to defend against unresolved claims, they cannot be available for distribution to the beneficiaries until and unless there is a liability determination adverse to those defendants.

That raises one of several related factual issues. Plaintiffs and intervenors appear to treat legal expenses as some sort of fungible mass. They are not. The lawsuit was against several defendants and raised several issues. Two defendants, Telco Marketing Services, Inc. and Televest, Inc., were apparently represented by a law firm which was not paid by the Plan, nor is there any apparent basis why they could have been. Libco and Engle were also apparently represented by this firm, and the expenses of their defense have not, apparently and for similar reasons, been paid by the Plan. The Plan and three fiduciaries have had their legal expenses advanced by the Plan. They represent that half of those expenses have been borne by an insurance carrier, something specifically sanctioned by ERISA so long as there is

recourse. 29 U.S.C. § 1110. Moreover, one of the fiduciaries has not been found liable for anything and the other two have been found liable on only one of the central issues. In those circumstances, some apportionment of defense costs is necessary before an order is entered directing reimbursement of the Plan.

That apportionment is somewhat in the nature of an accounting and could very well be referred to a magistrate for a recommendation and report. Given the proclivity in this case, however, for everything to escalate into a pierhead brawl, this court questions the desirability of initiating such a proceeding when subsequent events, *i.e.*, a determination of liability on other issues, could obviate the need for any such proceeding at all.

That leaves, then, approximately $80,000 presently in the reserve fund, a portion which is immediately distributable to the beneficiaries, and they have waited a long time. It cannot be used to pay the further legal expenses of defendants Dardick and Zuckerman respecting the damages issues left after conclusive determination of the breach of fiduciary duty issues arising from the investments. It may, however, be available to pay their and National Boulevard Bank's legal expenses in defending against other charges, depending on the outcome. This court is of the view, based on its present knowledge of the case, that those other issues are not likely to be so complex that they require an inordinate amount of legal effort. In those circumstances the court directs that $60,000 be distributed to the beneficiaries within 21 days and the balance be held for possible reimbursement of legal expenses and for the incidental expenses of maintaining the modest balance in trust.

## II. Remedy

This court now faces the "formidable task of finding an appropriate measure of damages, if any, with regard to all defendants found to be liable as fiduciaries." *Leigh v. Engle,* 727 F.2d at 137. The remedy statute for breach of fiduciary duty, 29 U.S.C. § 1109, gives two bases for liability.

First, fiduciaries are liable for "any losses to the Plan resulting from" any breaches. Second, fiduciaries must "restore to such Plan any profits of such fiduciary which have been made for use of assets of the Plan by the fiduciary."

### A. Losses

Defendants argue that because the plaintiff suffered no losses from the transactions involved, they cannot be liable for damages under the first part of Sec. 1109. The Second Circuit recently dealt with this question and disagreed. In *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir.1985), the court found liability for losses under Sec. 1109 even where the trust made a profit on the transaction. The court found the notion of opportunity cost fixed within trust law and determined that a trustee is liable for "any profit which would have accrued to the trust estate if there had been no breach of trust." *Id.*, at 1054, *quoting* Restatement (Second) of Trusts, § 205(c) (1959). *See also Eaves v. Penn*, 587 F.2d 453, 463 (10th Cir.1978). The court stated:

> In view of the intent expressed by Congress in providing for the recovery of "losses," in the absence of evidence of congressional attempt to penalize, as such, violations of section [1109], we hold that the measure of loss applicable under ERISA, section [1109], requires the comparison of what the Plan actually earned on the [attacked] investment, with what the Plan would have earned had the fund been available for other Plan purposes. If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained.

*Donovan v. Bierwirth*, at 1056.

■ This measure of opportunity cost is the appropriate measure of losses under Sec. 1109. While in *Donovan* there was only one purchase which had to be dealt with, the problems of loss determination in this case are exacerbated because there are three different transactions. Together the investments in the present case had a 72 per cent rate of return in about a year, a

rate that was unlikely to be matched by other Plan investments. The Hickory purchases alone, however, netted only 4 per cent in about a year.

■ The court believes that though the decision to use the fund's assets for the purchases, and the strategy used, was determined as a whole, plaintiffs and intervenors may elect to seek to prove opportunity losses on some investment, presumably Hickory, while seeking restoration of profits on others.

### B. Restoration of profits made through use of assets of the Plan.

In discussing the appropriate disgorgement remedy the Seventh Circuit stated that recovery of a fiduciary's profits could occur "only where there is a causal connection between the use of the Plan assets and the profits made by fiduciaries on the investment of their own assets." 727 F.2d at 137. "Plaintiff must be denied a windfall, but receive the benefit of such reasonable doubts as appear." *Id.* at 139. The court discussed certain copyright and trust cases where profits were apportioned according to what the profits were attributable. The court then stated that "the burden is on the defendants who are found to have breached their fiduciary duties to show which profits are attributable to their own investment, apart from their control of the Reliable Trust assets." *Id.* at 138.

This court received certain proposals by the parties and, dissatisfied, asked for new proposals. The second batch was not much different than the first. The intervening claimants have stated a generally proper standard: .

> The Engle group must restore all profits and all benefits which each fiduciary admits was received as a result of investing Plan assets. "All profits and all benefits" must be defined for purposes of formulating the appropriate remedy to meet every advantage that could be measured in monetary terms at the close of the controller take-over fight initiated or maintained by the Engle group.

That does not, however, indicate how such advantages should be measured.

After much thought and in the absence of any alternative bases for measurement proposed by the parties which accord with the appellate mandate, despite two invitations to do so, the court has determined what basis it wishes to have followed in the disgorgement determinations. The court is concerned with the value to the Engle group of the trust's purchase of the shares in question. The value of something to a certain purchaser is equal to what the purchaser would be willing to pay for it. *See generally* R. Posner, *The Economics of Justice*, 60–61 (1981). There were two points in each of the Engle group's stock transactions where the trust's purchase of shares had value to the Engle group: when they bought and when they sold. The court believes that the following determination is a proper method for transferring to the trust the value received by the Engle group through the trust purchases.

When the Engle group began to purchase the shares of the three corporations they undoubtedly endeavored to keep the fact of their purchases quiet as long as possible in order to keep the price of the shares down. Use of the trust assets to buy the shares of these companies may have allowed them to purchase their other shares at a lower price because of an absence of one identifiable group of purchasers. This advantage was noted by the Seventh Circuit when it stated that "the trust investments were made very early in the control contests, when it may have been particularly valuable to acquire the first shares discreetly." *Leigh v. Engle*, 727 F.2d at 138. Any price advantage to the trust was reflected in its purchase price and realized upon sale. Any price advantage received by the Engle group in their purchases of the Hickory, Berkely, and OSI stock, apart from the Plan and due to the Plan not being identified as a related purchaser, is, however, a profit attributable to the Plan investment. Thus, the difference. between what was actually paid for the block of shares purchased by the Engle group other than the trust purchases, and what would have been paid for those shares if all shares, including the trust investment, had been purchased entirely by defendants, should be divested. It is expected that expert testimony will be required to determine the difference between the two prices, if any difference exists at all.

When the defendants sold the shares of Berkeley and OSI it can be presumed that the premium received was, in some part, due to the extent of their holdings in the company. For example, when the OSI shares were sold, the Engle group owned 21.73 per cent of the company. *See Leigh v. Engle*, 727 F.2d at 121. In negotiating a sale, the Engle group was presumably able to negotiate a higher price than a group with 15 per cent, 10 per cent or 5 per cent. Of the block controlled by the Engle group, 1.22 per cent of the OSI stock was purchased by the trust assets. Any premium on the trust shares was realized upon sale. The trust fund is, however, entitled to recover whatever premiums there may have been on the Engle group shares other than the trust investment. That portion of any premium received on the other shares because of that extra 1.22 per cent is attributable to use of the trust assets and is recoverable by the Plan. Finally, given the burden of proof upon defendants, it will be presumed that all profits are attributable to the Plan assets in the absence of evidence to the contrary.

As for the Hickory stock, where no resale by the Engle group occurred, any profit in excess of that realized may be determined by a valuation of the company. The Engle group picked Hickory as a target because it believed it to be undervalued. *See Leigh v. Engle*, 727 F.2d at 117. It may well be, therefore, that an objective valuation of the company at that time of purchase from the Plan would have valued it at more than the amount the Engle group paid for the stock. The trust purchased about one per cent of the company (12,000 shares). *See id.* at 122. The trust, therefore, deserves one per cent of the

difference between the value of the company as of March 19, 1979, the date the trust sold its shares to defendants and the sales price to the Engle group. Again, expert testimony will probably be required to determine those values. Plaintiffs would probably be entitled to this amount or the difference between the opportunity value of the invested fund assets and the actual four per cent return, whichever is greater.

By requiring disgorgement of benefits obtained by both the purchase of the shares and the sale of the shares the court believes it most adequately restores to the Plan any profits of defendants "which have been made through use of assets of the Plan by the fiduciary." *See* 29 U.S.C. § 1109(a). The court recognizes that defendants are being required to disgorge benefits achieved at purchase, based on the assumption that they would have purchased the trust's shares if the trust had not, and disgorge benefits received at the sale, based on the assumption that they would not have purchased the trusts' shares if the trust had not. This contradiction is warranted, however, by the heavy burden of proof that is placed squarely upon defendants. *See Donovan v. Bierwith, supra,* at 1056. The Seventh Circuit, in remanding this case, drew analogies with copyright law and explicitly approved a formulation requiring that "doubts shall be resolved against the defendants so that the amount awarded 'will favor the plaintiffs in every reasonable chance of error.'" *Leigh v. Engle, supra,* 727 F.2d at 138, *quoting Sheldon v. Metro-Goldwyn Pictures Corp.,* 106 F.2d 45, 51 (2d Cir.1939) (Learned Hand, J.), *aff'd* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940). The court also recognizes that the proof will be difficult in these areas. Again, the burden rests on defendants and doubts will be resolved against them, but only within the parameters outlined by the court.

### III. Matters Still to be Litigated

Two issues of liability remain. First, the court must determine, in accordance with the principles laid out by the Seventh Circuit, *see Leigh v. Engle,* 727 F.2d at 132–36, whether Engle and Libco are liable as co-fiduciaries under 29 U.S.C. §§ 1104 and 1105. The court must also determine whether the defendants, or any of them, violated their fiduciary duties by delaying distribution of the trust. *See Leigh v. Engle,* 727 F.2d at 136–37. Finally, the court must determine what damages, if any, resulted from any improper delay. Evidence respecting investment and delay damages should be heard in the liability proceeding. Reimbursement issues, as well as sec. 1132(g)(1) attorneys' fees issues, will be subsequently determined. The court directs that the parties submit memoranda indicating what discovery, if any, each believes is necessitated by this Memorandum and Order and suggesting a schedule for the final resolution of this litigation. Those submissions shall be filed by July 10, 1985. A Rule 16 conference is hereby scheduled for July 12, 1985 at 4:30 p.m.