716 F.2d 1455
 4 Employee Benefits Ca 2329
 Raymond J. DONOVAN, Secretary of the United States
Department of Labor, Plaintiff-Appellant Cross-Appellee,
v.
Kenneth R. CUNNINGHAM, Defendant-Third Party
Plaintiff-Appellee-Cross-Appellant,
L.J. Carter and Mark W. Perrin, Defendants-Third Party
Plaintiffs-Appellees-Cross-Appellants-Cross-Appellees,
Salvador Esparza and Edward F. Fritcher, Defendants-Third
Party Plaintiffs-Appellees-Cross-Appellants,
v.
Wilford H. HAIRELL and A. Mitchell Robertson,
Defendants-Third Party
Plaintiffs-Appellees-Cross-Appellants-
Cross-Appellees,
v.
ALLIED BANK OF TEXAS, Third Party
Defendant-Cross-Appellee-Cross-Appellant,
v.
METROPOLITAN CONTRACT SERVICES, INC., Third Party
Defendant-Cross-Appellee.
 No. 82-2296.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 17, 1983.
 
 Paula J. Page, Edward A. Scallet, Attys., Dept. of Labor, Plan Benefits Sec. Div., Washington, D.C., for plaintiff-appellant cross-appellee.
 Susman & Kessler, Morton L. Susman, Houston, Tex., for Cunningham, Hairell, Robertson & Metropolitan Contract.
 Lorance & Thompson, Larry D. Thompson, Houston, Tex., for Carter & Perrin.
 Dickerson, Hamel, Early & Pennock, C. Leland Hamel, Houston, Tex., for Esparza & Fritcher.
 Butler, Binion, Rice, Cook & Knapp, Tom M. Davis, Jr., Daniel F. Shank, Houston, Tex., for Allied Bank of Texas.
 Appeals from the United States District Court for the Southern District of Texas.
 Before THORNBERRY, GEE and WILLIAMS, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 The Secretary of Labor brought this lawsuit against various fiduciaries of a certain employee stock ownership plan ("ESOP") established under the Employee Retirement Income Security Act of 1974 ("ERISA").[1] The Secretary's principal claim is that these defendants breached their duties as fiduciaries under ERISA by purchasing certain stock on behalf of the ESOP for more than adequate consideration. The suit was tried without a jury and the district court entered judgment for the defendants. The Secretary has appealed.
 
 
 2
 An ESOP is a form of employee benefit plan designed to invest primarily in securities issued by its sponsoring company. 29 U.S.C. Sec. 1107(d)(6) (1976). The ESOP concept is the brainchild of Louis O. Kelso, who has advanced it as a device for expanding the national capital base among employees--an effective merger of the roles of capitalist and worker.[2] Congress has enacted a number of laws designed to encourage employers to set up such plans. See note 23, infra.
 
 
 3
 As is true of all employee benefit plans covered by ERISA, ESOPs are subject to an impressive and somewhat bewildering array of rules and regulations governing their substance and administration, as well as their eligibility for favorable tax treatment. See generally L. Brown, ERISA Source Manual (1982-1983). For present purposes, an understanding of these details is unnecessary; a thumbnail sketch of basic ESOP mechanics will suffice. An employer desiring to set up an ESOP will execute a written document to define the terms of the plan and the rights of beneficiaries under it. 29 U.S.C. Sec. 1102(a) (1976). The plan document must provide for one or more named fiduciaries "to control and manage the operation and administration of the plan." Id., Sec. 1102(a)(1). A trust will be established to hold the assets of the ESOP. Id., Sec. 1103(a). The employer may then make tax-deductible contributions to the plan in the form of its own stock or cash. If cash is contributed, the ESOP then purchases stock in the sponsoring company, either from the company itself or from existing shareholders. Unlike other ERISA-covered plans, an ESOP may also borrow in order to invest in the employer's stock. In that event, the employer's cash contributions to the ESOP would be used to retire the debt. With this overview in mind, we can now turn to the facts relevant to the Secretary's appeal.
 
 Facts
 
 4
 Metropolitan Contract Services, Inc. ("MCS") is a contract trucking firm engaged in the business of making bulk deliveries for retail stores in several states. On December 15, 1975, the MCS board of directors voted to establish an ESOP (the "Metropolitan ESOP"), effective July 1, 1975, for the employees of MCS. The plan document provided that decisions regarding plan administration and investments were to be made by named fiduciaries composing a five-member administrative committee to be appointed by the MCS board of directors. In August 1976, the members of the MCS board of directors appointed themselves as the administrative committee of the ESOP, and at all times relevant to this case the current MCS directors served simultaneously as administrative committee members. As required by ERISA, a trust was established to maintain custody of ESOP assets. At all relevant times, Allied Bank of Texas ("Allied Bank") served as trustee.
 
 
 5
 During the time period when the Metropolitan ESOP was established and the transactions challenged by the Secretary took place, the board and administrative committee consisted of appellees Cunningham, Fritcher, Hairell, Robertson and Esparza. Mr. Cunningham was chairman of the board, chief executive officer and sole shareholder of MCS. Mr. Fritcher was secretary-treasurer and comptroller of MCS; defendants Hairell and Robertson were vice-presidents. Mr. Esparza was president of Metro Contract Services, Inc., another company wholly owned by Mr. Cunningham.
 
 
 6
 In 1977, after the challenged transactions had taken place, appellees Fritcher and Esparza were replaced on the board and administrative committee by appellees Perrin and Carter. Mr. Perrin, who had been outside counsel to MCS since before the ESOP was established, had become president of the company in mid-1977. Mr. Carter replaced Mr. Fritcher as comptroller.
 
 
 7
 The Secretary alleges that the appellees breached their fiduciary duties to the ESOP in connection with two transactions whereby the ESOP acquired MCS stock from Mr. Cunningham (the "ESOP transactions"). The first transaction occurred in August 1976. The defendants who were then members of the MCS board of directors[3] voted in that capacity to contribute $288,000 in cash to the ESOP for the purpose of acquiring stock from Cunningham. Then, in their capacity as members of the administrative committee, the same appellees voted to purchase 1440 shares of MCS stock from Cunningham at $200 per share for a total of $288,000. As a result of this transaction, the ESOP owned approximately 14% of the 10,100 outstanding MCS shares; Cunningham retained the remaining 86%.
 
 
 8
 The second challenged transaction occurred in February 1977. The same appellees, in their dual capacities as directors and administrative committee members, purchased on behalf of the ESOP an additional 5000 shares of MCS stock from Cunningham at $200 per share, for a total price of $1 million. To fund this second purchase, the administrative committee caused the ESOP to borrow $1 million from Allied Bank of Texas. Pursuant to the plan document and the loan agreement, MCS was obligated to make sufficient yearly ESOP contributions to amortize this loan. After this second transaction, the ESOP owned 34% of the outstanding MCS stock, and Cunningham held the balance of 66%.[4]
 
 
 9
 In his complaint, the Secretary alleged that the defendants who were members of the administrative committee at the time of the two ESOP transactions breached various duties imposed upon them by ERISA by "failing to follow the procedures necessary to determine the fair market value of the shares" and by "causing the Plan to pay defendant Cunningham more than adequate consideration" for his stock. Cunningham was alleged to have violated certain rules against self-dealing. The Secretary also alleged that the successor fiduciaries Perrin and Carter are liable as co-fiduciaries under ERISA for concealing or failing to remedy the misconduct of the other committee members. He sought to enjoin the defendants from violating ERISA and from serving as fiduciaries under ERISA for five years. He also asked the court to order defendants to "restore the Plan to its rightful economic place," and for other appropriate equitable relief.
 
 
 10
 We will first address the appellees' claims that for various reasons the district court's judgment in their favor is no longer reviewable. Because we conclude that such is not the case, we will review the merits by first examining the relevant provisions of ERISA and will then seek to measure the defendants' conduct by the yardstick set up by the statute.
 
 Reviewability
 
 11
 The appellees argue that the Secretary's appeal must be dismissed because of the preclusive effect of a settlement entered in a related lawsuit. They argue that the settlement renders this appeal moot, or alternatively that it bars our consideration of the issues presented by way of res judicata or collateral estoppel. We are not persuaded.
 
 
 12
 The Secretary filed the present action in January of 1980. In October of 1980, a number of private plaintiffs, some of whom were beneficiaries of the Metropolitan ESOP,[5] filed a class action in Alabama federal district court (the "Alabama lawsuit") against the same persons who are defendants in the present case. The plaintiffs in the Alabama lawsuit complained of the same transactions at issue in the present case, contending, as does the Secretary, that the defendants breached their duties under ERISA.[6]
 
 
 13
 The present case proceeded to judgment and this appeal was filed. The defendants then offered to settle the Alabama lawsuit. Relying in part upon the district court's decision in this case, the Alabama district court approved and entered a comprehensive settlement agreement that purports to bind all participants in the Metropolitan ESOP and all defendants in that case. Adcock v. Pioneer Contract Services, Inc., No. CV80-L-5274-NE (N.D.Ala. July 30, 1982) (unpublished final order). The agreement provides that all issues of the defendants' performance of their fiduciary duties are settled, that Cunningham's sales to the Metropolitan ESOP were made for "adequate consideration," and that the ESOP is to be dissolved. Under the agreement, MCS and its insurers (not the individual defendants) became obligated to pay sums totalling $82 per share of MCS stock owned by the ESOP into a court-administered trust fund.[7] The trustee will distribute cash pro rata to the former ESOP participants. The MCS stock held by the ESOP will be returned to MCS by the trustee. Finally, the agreement provides that "inasmuch as it is the intention of the parties to settle all issues, including those relating to the value of the stock sold to ... the Metropolitan ESOP," any payments related to the price of that stock made "as a result of any private litigation or any action by the United States, shall be returned by the Trustee to the person making such payment."
 
 
 14
 Mootness. The appellees argue that this settlement agreement renders the present appeal moot because this court is now unable to award any relief of "practical significance." It is certainly true that "if, pending an appeal an event occurs which renders it impossible for [an] appellate court to grant any relief or renders the decision unnecessary, the appeal will be dismissed as moot." Thibaut v. Ourso, 705 F.2d 118, 121 (5th Cir.1983) (quoting NLRB v. O.E. Szekely & Assoc., Inc., 259 F.2d 652, 654 (5th Cir.1958)) (emphasis deleted). Obviously, the granting by another court of the relief sought would constitute such an event. See Washington Market Co. v. District of Columbia, 137 U.S. 62, 11 S.Ct. 4, 34 L.Ed. 572 (1890); 13 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure Sec. 3533 at 276 & n. 60 (1975 & Supp.1980). However, the settlement agreement did not render all relief sought by the Secretary either unnecessary or impossible to achieve; his claims for injunctive relief are not moot.[8]
 
 
 15
 The appellees argue that because the Metropolitan ESOP has been dissolved, and because none of the appellees is currently a fiduciary under a plan covered by ERISA and none of them intends to serve in such a capacity, any injunctive relief secured by the Secretary would be of no practical, "real-world" significance. We do not agree. The injunctive relief sought by the Secretary is not limited to actions affecting the Metropolitan ESOP. He asks that if violations of ERISA are found, the appellees be enjoined from violating the statute in the future and, more specifically, that they be enjoined from serving as fiduciaries under any ERISA plan for a five-year period.
 
 
 16
 It is well-settled that, in a suit for injunctive relief, the voluntary cessation of allegedly illegal conduct does not moot the controversy arising from the challenged activity. See, e.g., Allee v. Medrano, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); United States v. Concentrated Phosphate Export Ass'n., 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); United States v. Realty Multi-List, Inc., 629 F.2d 1351, 1387-88 (5th Cir.1980). This is because "[t]he defendant is free to return to his old ways." United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). To obtain a dismissal on mootness grounds, a defendant bears a heavy burden to show that "there is no reasonable expectation that the wrong will be repeated." Id. at 633, 73 S.Ct. at 897. The appellees have not done so here. Their bare assurances that they do not intend to serve as ERISA fiduciaries in the future are clearly insufficient to meet their burden of persuasion. Id.; United States v. Concentrated Phosphate Export Ass'n., 393 U.S. at 203, 89 S.Ct. at 364. This is particularly true in the face of appellees' continuing insistence that their discontinued activities were legal and their continued occupation of positions that would enable resumption of ESOP activities. See Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944); Meltzer v. Board of Public Instruction of Orange County, 548 F.2d 559, 571-73 (5th Cir.1977) modified, 577 F.2d 311 (5th Cir.1978) (en banc), cert. denied, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); 13 C. Wright et al, supra, at 282. The potential for recurrence established by these facts, coupled with the public interest in having the legality of the challenged practices settled,[9] leads us to conclude that a live controversy is presented and accordingly that this case is not moot.
 
 
 17
 Res Judicata and Collateral Estoppel. The appellees also contend that the Alabama settlement agreement is res judicata of the present action or, alternatively, that the Secretary is at least precluded from relitigating certain issues resolved by the settlement. This argument misapprehends the nature of the Secretary's lawsuit.
 
 
 18
 Our court has recently described "the general principle of law that the United States will not be barred from independent litigation by the failure of a private plaintiff." United States v. East Baton Rouge Parish School Board, 594 F.2d 56, 58 (5th Cir.1979) (collecting cases); 18 C. Wright, et al, supra, Sec. 4458 at 520.
 
 
 19
 This principle is based primarily upon the recognition that the United States has an interest in enforcing federal law that is independent of any claims of private citizens.... Also, any contrary rule would impose an onerous and extensive burden upon the United States to monitor private litigation in order to ensure that possible mishandling of a claim by a private plaintiff could be corrected by intervention.
 
 
 20
 East Baton Rouge Parish, 594 F.2d at 58 (footnote omitted).
 
 
 21
 The cases that have developed this principle have often involved statutory schemes like ERISA that provide for private enforcement of individual rights as well as suits by the government to vindicate the public interest in compliance with the law. For example, in suits to enforce Section 5 of the Voting Rights Act, the Attorney General of the United States is not bound by the results of prior litigation of the same issues by private parties. Hathorn v. Lovorn, 457 U.S. 255, 268 n. 23, 102 S.Ct. 2421, 2430 n. 23, 72 L.Ed.2d 824 (1982); City of Richmond v. United States, 422 U.S. 358, 373 n. 6, 95 S.Ct. 2296, 2305 n. 6, 45 L.Ed.2d 245 (1975); East Baton Rouge Parish, supra. Similarly, the Equal Employment Opportunity Commission may bring discrimination charges against an employer even after its employees have settled their private claims. New Orleans Steamship Ass'n. v. EEOC, 680 F.2d 23, 25 (5th Cir.1982); EEOC v. Kimberly-Clark Corp., 511 F.2d 1352, 1361 (6th Cir.), cert. denied, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975).
 
 
 22
 As in those cases, the Secretary in the present case seeks to vindicate a public interest that is broader than the interests of the plaintiffs in the Alabama lawsuit. Those plaintiffs were interested in recouping only their own economic losses; the Secretary seeks to determine the legality of specific conduct and to prevent those who have engaged in illegal activity from causing loss to any future ERISA plan participant. Thus, although the monetary settlement sought in the prior litigation may have achieved the goals of the private plaintiffs, it is clearly inadequate to vindicate the broader interest of the government.[10] Accordingly, the plaintiffs in the Alabama lawsuit were not proper representatives of the government interest and the Secretary is not precluded from relitigating here the issues raised in that case.[11]
 
 Duties of ESOP Fiduciaries under ERISA
 
 23
 The parties agree that in their capacities as members of the Metropolitan ESOP administrative committee, the appellees were fiduciaries as that term is defined in ERISA.[12] Establishment of standards of fiduciary responsibility in the pension plan context was one of the primary objectives of ERISA.[13] Accordingly, the statute includes a comprehensive scheme of both general and specific provisions regulating the conduct of fiduciaries. The Secretary has charged the appellees with violating the general fiduciary responsibility standards of ERISA Section 404 as well as the specific prohibited transaction rules of Section 406 in consummating the two ESOP transactions.
 
 
 24
 The general duties of fiduciaries are set out in Section 404 of ERISA:
 
 
 25
 [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 
 
 26
 (A) for the exclusive purpose of:
 
 
 27
 (i) providing benefits to participants and their beneficiaries; and
 
 
 28
 (ii) defraying reasonable expenses of administering the plan;
 
 
 29
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter.
 
 29 U.S.C. Sec. 1104(a) (1976).[14]
 
 33
 As we have observed before, Section 404 imposes upon fiduciaries a duty of loyalty and a duty of care. Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1260 (5th Cir.1980). The legislative history of ERISA indicates that Congress intended to incorporate in Section 404 the "core principles of fiduciary conduct" that were developed in the common law of trusts, but with modifications appropriate for employee benefit plans.[15] Also, Congress has exhorted those who must interpret and apply ERISA's fiduciary standards to do so "bearing in mind the special nature and purpose of employee benefit plans." H.R.Rep. No. 1280, supra, 1974 U.S.Code Cong. & Ad.News at 5083. See Marshall v. Glass/Metal Ass'n. & Glaziers & Glassworkers Pension Plan, 507 F.Supp. 378, 383 (D.Ha.1980). ("[Section 1104] establish[es] uniform federal requirements to be interpreted both in the light of the common law of trusts, as well as with a view toward the special nature, purpose, and importance of modern employee benefit plans.").
 
 
 34
 As a supplement to the general duties imposed on fiduciaries by Section 404, ERISA also incorporates a detailed list of specifically prohibited transactions.[16] These prohibited transaction rules are an important part of Congress's effort to tailor traditional judge-made trust law to fit the activities of fiduciaries functioning in the special context of employee benefit plans. The object of Section 406 was to make illegal per se the types of transactions that experience had shown to entail a high potential for abuse. Cutaiar v. Marshall, 590 F.2d 523, 529 (3d Cir.1979); Marshall v. Kelly, 465 F.Supp. 341, 354 (W.D.Ok.1978); see also Iron Workers v. Bowen, 624 F.2d at 1261. In the complex setting of employee benefit plans, brightline rules are advantageous to beneficiaries and fiduciaries alike, providing assured protection to the former and clear notice of responsibility to the latter.
 
 
 35
 Unfortunately, the present case is not easily solved by application of bright-line rules. In addition to violations of Section 404, the Secretary has charged the MCS fiduciaries with violating Section 406 by causing the ESOP to enter into a transaction with, and transfer its assets to, a "party in interest."[17] The Secretary also alleged that Cunningham violated Section 406 by dealing with plan assets in his own interest or on behalf of someone with an interest adverse to the plan.[18]
 
 
 36
 These per se rules are not automatically applicable to ESOP fiduciaries, however. Doubtlessly recognizing that such absolute prohibitions would significantly hamper the implementation of ESOPs, particularly by small companies, Congress enacted in Section 408 a conditional exemption from the prohibited transaction rules for acquisition of employer securities by ESOPs and certain other plans. 29 U.S.C. Sec. 1108(e) (1976). An ESOP may acquire employer securities in circumstances that would otherwise violate Section 406 if the purchase is made for "adequate consideration." Id.[19]
 
 
 37
 The crux of the Secretary's case is his claim that the appellees purchased MCS stock from Cunningham for more than adequate consideration. Obviously, the Section 406 violations can be established only if the "adequate consideration" exemption from Section 406 is not applicable. Similarly, the Secretary's claim that the appellees' conduct violated their general duties of loyalty and prudence under Section 404 is based on his view that they paid too much for the stock. He does not contend that the stock purchases were not undertaken "solely in the interest of the participants" of the ESOP for any other reason,[20] nor does he contend that the purchase of MCS stock, if made for adequate consideration, would have been imprudent for some other reason. Thus, although payment of adequate consideration is a statutory defense only to a violation of Section 406, and not of Section 404, under the Secretary's theory of this particular case, our inquiry will be the same.[21]
 
 
 38
 In Section 3(18) ERISA provides that "in the case of an asset other than a security for which there is a generally recognized market," the term "adequate consideration" means "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C. Sec. 1002(18) (1976) (emphasis added). Predictably, the parties espouse sharply differing views of the meaning of this language. The appellees contend that their subjective good faith in setting a purchase price is all that the statute requires. The Secretary has pitched his tent at the opposite pole: notwithstanding his failure during the eight years of ERISA to promulgate regulations as the statute contemplates, he urges us to require ESOP fiduciaries to follow a set of highly specific estate and gift tax regulations promulgated by the Internal Revenue Service to guide valuation of closely-held stock for tax purposes. We reject both approaches.
 
 
 39
 It is not surprising that the legislative history of ERISA contains no more than passing reference to the adequate consideration provision; the statute itself makes clear that Congress intended for the Secretary to flesh out the standards for fiduciaries to follow in establishing that figure.[22] As noted, he has not done so. Moreover, until the present case, no court has had occasion to interpret or apply Section 3(18). It is with some trepidation that we undertake to be the first to do so, unaided by the views of others, for we must satisfy the demands of Congressional policies that seem destined to collide. On the one hand, Congress has repeatedly expressed its intent to encourage the formation of ESOPs by passing legislation granting such plans favorable treatment,[23] and has warned against judicial and administrative action that would thwart that goal.[24] Competing with Congress' expressed policy to foster the formation of ESOPs is the policy expressed in equally forceful terms in ERISA: that of safeguarding the interests of participants in employee benefit plans by vigorously enforcing standards of fiduciary responsibility. See note 13, supra.
 
 
 40
 Our task in interpreting the statute is to balance these concerns so that competent fiduciaries will not be afraid to serve, but without giving unscrupulous ones a license to steal. More, though we are guided by principles of trust law, we must bear in mind that in ERISA Congress departed from the absolute common law rule against fiduciaries' dual loyalties. ERISA clearly provides that a fiduciary may be an officer or employee of the company whose securities he purchases on behalf of a plan. 29 U.S.C. Sec. 1108(c)(3); see generally Donovan v. Bierwirth, 538 F.Supp. 463, 468 (E.D.N.Y.1981), modified, 680 F.2d 263 (2d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 488, 74 L.Ed.2d 631 (1983). Thus, the stringent prophylactic rules of the common law cannot be incorporated reflexively under the statute.
 
 
 41
 An examination of the structure of ERISA's fiduciary responsibility provisions shows that Congress was aware of, and has struck a balance between, the competing policies we have identified. Though freed by Section 408 from the prohibited transaction rules, ESOP fiduciaries remain subject to the general requirements of Section 404. Eaves v. Penn, 587 F.2d 453 (10th Cir.1978); cf. Donovan v. Bierwirth, 680 F.2d at 271.[25] Their principal responsibility in selecting investments is to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. Sec. 1104(a)(1)(B) (1976). Under ERISA, as well as at common law, courts have focused the inquiry under the "prudent man" rule on a review of the fiduciary's independent investigation of the merits of a particular investment, rather than on an evaluation of the merits alone. Donovan v. Mazzola, 716 F.2d 1226 (9th Cir.1983); Donovan v. Bierwirth, 538 F.Supp. at 470, 680 F.2d at 273; Marshall v. Glass/Metal Ass'n., 507 F.Supp. at 384; III A. Scott, The Law of Trusts Sec. 227.1 at 1809-11 (3d ed. 1967); Note, Fiduciary Standards and the Prudent Man Rule Under the Employment [sic] Retirement Income Security Act of 1974, 88 Harv.L.Rev. 960, 965 (1975). As a leading commentator puts it, "the test of prudence--the Prudent Man Rule--is one of conduct, and not a test of the result of performance of the investment. The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed." 19B Business Organizations, S. Young, Pension and Profit-Sharing Plans Sec. 17.02 at 17-29. In addition, the prudent man rule as codified in ERISA is a flexible standard: the adequacy of a fiduciary's investigation is to be evaluated in light of the "character and aims" of the particular type of plan he serves.[26]
 
 
 42
 We think an understanding of these general fiduciary duty provisions sheds a great deal of light on the meaning of Section 3(18). ERISA's requirement that ESOP fiduciaries purchase employer stock for "adequate consideration" must be interpreted so as to give effect to the Section 404 duties to which those persons remain subject. In this regard, it is especially significant that the adequate consideration test, like the prudent man rule, is expressly focused upon the conduct of the fiduciaries. A court reviewing the adequacy of consideration under Section 3(18) is to ask if the price paid is "the fair market value of the asset as determined in good faith by the ... fiduciary;" it is not to redetermine the appropriate amount for itself de novo. Contrary to the appellees' contentions, this is not a search for subjective good faith--a pure heart and an empty head are not enough. The statutory reference to good faith in Section 3(18) must be read in light of the overriding duties of Section 404. Doing so, we hold that the ESOP fiduciaries will carry their burden to prove that adequate consideration was paid[27] by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing.[28]
 
 Liability of the Principal Fiduciaries
 
 43
 In this section we consider whether the five fiduciaries who approved the ESOP transactions fulfilled their duties.
 
 
 44
 The Secretary charged appellee Cunningham with violating Section 404 by failing to act in accordance with plan documents. 29 U.S.C. Sec. 1104(a)(1)(D) (1976). The Metropolitan ESOP plan document provides that "[a]ny Committee member having any interest in a transaction being voted upon by the Committee shall not vote thereon nor participate in the decision." The Secretary alleged that Cunningham had participated in the administrative committee's decision and voted to buy MCS stock.
 
 
 45
 The district court expressly found that "Mr. Cunningham did not participate in the vote or decision concerning the purchase by the ESOP of the MCS stock." Donovan v. Cunningham, 541 F.Supp. 276, 287 (S.D.Tex.1982). In finding that Mr. Cunningham did not vote, the court was required to resolve conflicting testimony. The Secretary does not seriously attack this finding and we do not consider it clearly erroneous. However, Mr. Cunningham's unrefuted testimony, in deposition and at trial, was that he did participate in the fiduciaries' decision to pay $200 per share for it. The district court's finding to the contrary is clearly erroneous and we conclude that Cunningham acted contrary to the terms of the plan document in violation of Section 404.
 
 
 46
 We come now to the heart of this case. The district court held that the fiduciaries who approved the ESOP transactions had taken steps to determine the fair market value of MCS stock that were "reasonable and prudent for individuals in the position of these members of the Administrative Committee of the MCS ESOP." 541 F.Supp. at 287. These steps consisted of reliance upon an independent appraisal of MCS by the investment banking firm of Rotan Mosle, Inc., updated by the appellees' personal assessments of the company's financial prospects based upon their knowledge as company insiders. Id. at 283, 287. Though other facts that might have borne upon a valuation decision were brought out at trial,[29] our review of the appellees' testimony regarding their decisionmaking processes confirms the district court's finding that the decision to pay $200 per share for MCS stock was based upon the appellees' belief that the appraisal remained a fair estimation of market value at the times the stock was purchased.
 
 
 47
 In its appraisal report, Rotan Mosle stated that it had undertaken to estimate the fair market value of a 100 percent block of MCS stock as of June 30, 1975. Although Rotan Mosle did not explain in detail the actual mechanics of its valuation determination in the report, it did set out the various pieces of information upon which it based its analysis. Principal among these were projections of future revenues and earnings made by MCS management, a comparative financial analysis of MCS and five similar companies, a set of recast MCS financial statements, and a prior offer by a third party to purchase all MCS shares for $158 each. All parties and their expert witnesses agreed that Rotan Mosle's estimate of $200 per share was a reasonable approximation of the fair market value of 100 percent of the MCS stock on the valuation date. The crucial question is whether the fiduciaries prudently determined that it remained so at the time and in the circumstances of the two ESOP transactions, some 13 and 20 months later.
 
 
 48
 At trial the Secretary mounted a two-pronged attack on the fiduciaries' decisionmaking process. First, he argued that it was imprudent to rely on the Rotan Mosle appraisal because it was out of date by the time of the ESOP transactions--the factual assumptions upon which it was based were no longer valid. In addition, he urged that failure to discount the value ascribed to a 100 percent controlling block of shares when setting the price to be paid for a minority block of shares with no ready market violated general principles of valuation. Based upon several factfindings that we discuss below, the district court rejected the Secretary's arguments. Though we do not find most of these findings clearly erroneous, we do disagree with the district court's legal conclusion: in our view, the appellees have not shown facts that establish their prudent investigation of the price they paid for MCS stock.
 
 
 49
 As noted, the Rotan Mosle appraisal was based in part upon revenue and income projections prepared by MCS management. Projected revenue for the 1976 fiscal year was $6.5 million; projected income was approximately $400,000. These figures are based upon actual revenues of $4.2 million for the year ended June 30, 1975, the addition of three or four anticipated new contracts, and a 10-15 percent inflation factor. 541 F.Supp. at 282. Rotan Mosle assumed that this growth rate would continue indefinitely.
 
 
 50
 Largely due to the fact that the contracts foreseen failed to materialize, actual revenues for the year ended June 30, 1976 totalled only $4.1 million--slightly less than the previous year and significantly less than the projection upon which Rotan Mosle's appraisal was based. Nevertheless, the first ESOP transaction was consummated in August 1976 at the appraised price.
 
 
 51
 By the time of the February 1977 ESOP transaction, some 20 months after the Rotan Mosle appraisal, the projected revenues still had not materialized. For the seven months ending January 31, 1977, actual revenue was $2.8 million, which, on an annualized basis, would total approximately $4.8 million. On the day before the second ESOP transaction, appellee Fritcher, the MCS controller, prepared a schedule of actual and estimated revenue, projecting revenues of $5.3 million for the 1977 fiscal year. His estimate was close--actual revenue for the year ended June 30, 1977, was about $5.6 million. Again, though each of these figures was significantly less than the performance level that Rotan Mosle had assumed would be achieved a year earlier, the $200 appraised price was paid by the ESOP.
 
 
 52
 The appellees testified that although they knew that the projections relied upon by Rotan Mosle had not been met, they relied upon knowledge they had gained as managers of MCS to conclude that the company was just as strong, and hence just as valuable, as when Rotan Mosle appraised it. Specifically they stated that they relied upon their knowledge of contract negotiations and their belief that significant new contracts would come "on stream" in the near future. The district court credited this testimony, finding it corroborated by the fact that several significant new contracts were in fact obtained during fiscal 1978 during which MCS collected revenues of approximately $12.6 million. We agree with the district court that appellees were entitled to consider the information available to them by virtue of their management positions at MCS, but we do not agree that their testimony establishes an investigation sufficient to warrant continued reliance on the Rotan Mosle appraisal.
 
 
 53
 The insufficiency of appellees' investigation lies in their failure to identify the facts and assumptions underlying the Rotan Mosle appraisal and to consider whether they remained valid at the time of the ESOP transactions. Cursory study of Rotan Mosle's report would have shown that they did not in several material respects.
 
 
 54
 As we have explained, the Rotan Mosle appraisal was based in part upon a projection that MCS revenues would increase from $4.2 million in fiscal 1975 to $6.5 million the following year. That was, however, only the starting point of Rotan Mosle's revenue projection. Much more important was the assumption, stated clearly in Rotan Mosle's report, that "[i]t is anticipated that this annual growth rate will continue indefinitely." Thus, the continued validity of the $200 appraised stock price was dependent in part upon the timing of revenue increases, and not, as the appellees apparently assumed, solely upon whether they could expect to secure the anticipated new contracts at some time in the future.
 
 
 55
 At the time of the first ESOP transaction, the appellees knew that their growth projection for fiscal 1976 had been much too high--revenues had actually declined. By the time of the second ESOP transaction, it was clear that the 1977 shortfall would be even more significant--still well short of the performance level predicted for the prior year. Even if Rotan Mosle had not assumed the company would continue to grow rapidly, these facts should have caused prudent fiduciaries to question whether continued reliance on the Rotan Mosle appraisal was warranted.[30]
 
 
 56
 In the first place, their own views of the company's prospects had proved overly optimistic for two years running. This should have cautioned them against relying so heavily on their own prognostications when investing the money of others. Moreover, even if their claims that they knew of the company's impending economic turnaround are credited, as the district court did, such information would be only the starting point of an inquiry into the continued validity of the appraisal. There is no question that a two-year delay in achieving the performance levels assumed by Rotan Mosle should be considered as a negative factor in such an inquiry--a strong negative, given the size of the revenue and income shortfalls during that period. Appellees apparently did not consider the timing of the new contracts to be important. Their testimony reveals no effort to analyze--either by their own computations or through consultations with advisors--the cumulative effect of this negative factor, together with the positive factor represented by the anticipated contracts, upon the Rotan Mosle appraisal.[31]
 
 
 57
 Much more important than the appellees' failure to consider the timing of the projected new contract revenue is their failure to take into account the dramatic rate of growth that was built into the Rotan Mosle appraisal analysis. In setting a price of $200 for the MCS stock, Rotan Mosle had assumed that revenues would increase by approximately 55 percent in fiscal 1976--from $4.2 million to $6.5 million--and that this annual growth rate would continue indefinitely. Simple arithmetic shows that at the annual growth rate anticipated by Rotan Mosle, revenues were expected to increase from $6.5 million in fiscal 1976 to $10 million in fiscal 1977 and $15.5 million in fiscal 1978. Thus, even if the appellees are credited with the prescience to have predicted the full $12.6 million of fiscal 1978 revenues prior to the two ESOP transactions,[32] the performance of MCS at levels consistently and significantly below those anticipated by Rotan Mosle should have alerted them that the appraisal was seriously out of date.
 
 
 58
 The failure of MCS to achieve its projected growth was not the only way in which the assumptions underlying the Rotan Mosle appraisal had significantly changed by the time of the ESOP transactions. The establishment of the ESOP itself was such a change--Rotan Mosle had not assumed that an ESOP existed when it appraised the MCS stock.[33]
 
 
 59
 The most obvious effect that an ESOP will have upon a company is the cash drain represented by the company's contributions to the plan. These contributions represent additional labor cost to the company and hence are not available to the shareholders as profits. Their effect upon the financial condition of the company must be taken into account by fiduciaries in their decision to fund and operate an ESOP. Eaves v. Penn., 587 F.2d 453 (10th Cir.1978). In Eaves, the court held that the trustee of an ESOP breached his fiduciary duties by causing it to enter into a transaction to purchase a majority of the shares of the sponsoring company from its sole owners. To effect the purchase, the trustee in his capacity as an officer of the sponsoring company caused the company to make a large advance contribution to the ESOP. The court found that before its sale to the ESOP the company had enjoyed a strong financial condition but that the large advance ESOP contribution, coupled with the trustee's mismanagement, caused the company to suffer severe financial reverses. 587 F.2d at 456. For these and other reasons, the court held that the trustee violated his fiduciary duty. Id. at 462.
 
 
 60
 In the present case, the appellees testified that it was their intention for the ESOP to purchase 100 percent of the MCS stock over a five to ten year period, possibly in as little as three years, depending upon how quickly MCS could earn the money to fund the plan. Thus, at the time of the first ESOP transaction, it was the appellees' intent to cause MCS to transfer $2,020,000 of its earnings within a relatively short period of time (10,100 shares X $200). By the time of the second ESOP transaction, an additional 9,000 shares of MCS stock were outstanding due to the purchase of Metro, see note 4, supra, so that a total of $3,820,000 (19,100 X $200) would be required to fully fund the ESOP's purchase of MCS. More, by leveraging the second transaction, the appellees rendered MCS's ESOP contributions no longer entirely discretionary--the company became obligated to contribute at least $1 million to the ESOP to amortize the loan from Allied Bank.
 
 
 61
 The appellees introduced very little evidence of their consideration of the impact of these outflows upon the value of MCS stock. The only committee member to testify on the issue was Mr. Cunningham. In November of 1977, after the ESOP transactions were completed, he had received a letter from Mr. Moroney, an officer of Rotan Mosle, in response to some inquiries he had made. One of the subjects addressed in the letter was Rotan Mosle's treatment of ESOP contributions:
 
 
 62
 We do not consider a corporation's contribution to its Employee Stock Ownership Plan an operating expense in the usual sense of the term because the corporation is under no obligation to continue making such contributions. In that respect such contributions resemble dividends, which the corporation may pay or pass in the discretion of its board of directors.
 
 
 63
 D.Ex. 16. When asked if this subject had been discussed with Rotan Mosle before the ESOP transactions were entered into, Mr. Cunningham testified that he "believe[d] it came up." When asked if the position taken in the letter was consistent with Mr. Moroney's position prior to the ESOP transactions, Mr. Cunningham replied, "Yes, he's always been consistent." 19 R. at 70.
 
 
 64
 We will assume that this vague testimony establishes that the appellees received the advice contained in the Moroney letter before consummating the ESOP transactions.[34] This avails them little, however, because, like the Rotan Mosle appraisal report, it was apparent that the assumptions upon which Mr. Moroney's opinion was based did not obtain at the time of the ESOP transactions. Mr. Moroney indicated only that ESOP contributions should be omitted from income computations for valuation purposes when they are discretionary, that is, when the company is not obliged to make them. As we have explained, MCS was obligated to make $1 million in contributions by virtue of the leveraged ESOP transaction. Moreover, the appellees did not intend to make other contributions on a discretionary basis; they all testified that it was their intent from the outset to make contributions sufficient to fund the purchase of all MCS stock by the ESOP in a few years. Since the Rotan Mosle appraisal did not take into account the effects of these contributions, and since the reason the appellees had been given for disregarding such payments was inapplicable in the circumstances, once again we think that prudent fiduciaries would have considered themselves on notice that the appraisal should have been updated.[35]
 
 
 65
 The Secretary also urges us to hold that ESOP fiduciaries must always discount the appraised price of a controlling block of stock when less than control is acquired by the ESOP. The Secretary bases his discount argument upon Revenue Ruling 59-60[36] which sets out principles for valuing closely-held stock for estate and gift tax purposes. Two of these principles are that discounts from the price commanded by a controlling block of stock may be appropriate when a minority interest is purchased, or when stock with limited marketability is acquired. 1959-1 Cum.Bull. at 241-42.
 
 
 66
 Judicial adoption of this revenue ruling is no substitute for the regulations the Secretary has never promulgated; we are unwilling to hold that ERISA fiduciaries who fail to follow it jot and tittle have breached their duties.[37] Appraisal of closely-held stock is a very inexact science; given the level of uncertainty inherent in the process and the variety of potential fact patterns, we do not think a court should require fiduciaries to follow a specific valuation approach as a matter of law under Section 3(18). The standard they must follow remains one of prudence. If more specific rules are needed, the better--and fairer--approach is to inform fiduciaries of them beforehand by regulation.[38]
 
 
 67
 To sum up, we hold that appellees Cunningham, Fritcher, Hairell, Robertson and Esparza failed to conduct an investigation sufficient to determine if the Rotan Mosle appraisal remained a reasonable approximation of the fair market value of MCS stock at the times they relied on it. Two critical assumptions made by Rotan Mosle--the growth projections and the absence of an ESOP--no longer were valid.[39] Had the appellees compared the 17-page Rotan Mosle report and its exhibits with the information at their disposal when they bought MCS stock for the ESOP, they should have realized this. In these circumstances, it was not enough for fiduciaries simply to rely on their generalized notions that the company's prospects were good. The appraisal represented a quantitative analysis of specific facts and assumptions. Prudent fiduciaries would have sought to analyze the effect of obvious changes in those facts and assumptions--either by their own efforts or with the help of advisors. An independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled. It is a tool and, like all tools, is useful only if used properly. To use an independent appraisal properly, ERISA fiduciaries need not become experts in the valuation of closely-held stock--they are entitled to rely on the expertise of others. See note 26, supra. However, as the source of the information upon which the experts' opinions are based, the fiduciaries are responsible for ensuring that that information is complete and up-to-date. In failing to do so, the appellees breached their duties of prudence under Section 404 and likewise cannot establish that they paid adequate consideration. Accordingly, the ESOP transactions also were prohibited by Section 406.
 
 Liability of Successor Fiduciaries
 
 68
 Appellees Carter and Perrin became members of the administrative committee of the Metropolitan ESOP after the challenged ESOP transactions had taken place. The Secretary alleged that Carter and Perrin knew that the other appellees had breached their fiduciary duties in connection with those transactions and that Carter and Perrin had therefore violated Section 405 of ERISA by concealing those breaches and by failing to remedy them.[40]
 
 
 69
 In view of its conclusion that the other fiduciaries had not breached their duties, the district court held that Carter and Perrin had not violated Section 405. Our decision that the other appellees acted in violation of ERISA necessitates reconsideration by the district court of the allegations against Carter and Perrin. Section 405 does not impose vicarious liability--it requires actual knowledge by the co-fiduciary. "Under this rule, the fiduciary must know the other person is a fiduciary with respect to the plan, must know that he participated in the act that constituted a breach, and must know that it was a breach." H.R.Rep. No. 1280, supra, 1974 U.S.Code Cong. & Ad. News at 5080. The knowledge of Carter and Perrin is a question of fact for the district court to resolve on remand, either on the record as it stands or supplemented as the district court in its discretion deems necessary.
 
 Attorneys' Fees
 
 70
 Award to Defendants. The district court awarded costs and attorneys' fees against the government in favor of the defendants under the Equal Access to Justice Act. 28 U.S.C. Sec. 2412(a) and (b) (Supp.1983). Since under our decision today the defendants no longer remain "prevailing parties," that award must be reversed.
 
 
 71
 Award to Allied Bank. The Secretary did not take any action against Allied Bank, the trustee of the Metropolitan ESOP. Appellees Cunningham, Hairell and Robertson brought a third-party complaint against Allied Bank, alleging that it was liable as a co-fiduciary and seeking contribution and indemnity. Allied Bank denied any breach of fiduciary duty and counterclaimed for indemnity, costs and attorneys' fees. The district court awarded costs and attorneys' fees to Allied Bank against Cunningham individually under ERISA Section 502(g).[41]
 
 
 72
 An award of attorneys' fees under Section 502(g) is reviewable only for abuse of discretion. Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1264-66 (5th Cir.1980). Among the factors that should inform a district court's exercise of discretion are:
 
 
 73
 (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.
 
 
 74
 Id. at 1266 (footnote omitted).
 
 
 75
 In its opinion, the district court reviewed the merits of the third party claims against Allied Bank and explained its conclusion that Cunningham should pay the bank's litigation expenses: "The court has determined that the award is appropriate in such form because the third party actions against Allied were unfounded and were designed it appears only to secure Allied's presence in the suit to aid in defense of the primary suit. Further, Cunningham is in the financial position to satisfy the award of fees and costs while the other defendants are not." 541 F.Supp. at 290. We have reviewed the relevant portions of the record and agree with the court's stated analysis of the merits of the third party claims. See id.; see generally Robbins v. First American Bank of Virginia, 514 F.Supp. 1183, 1189-91 (N.D.Ill.1981) (collecting cases). We therefore conclude that its award was not an abuse of discretion.[42]Conclusion
 
 
 76
 The judgment of the district court in favor of appellees Cunningham, Fritcher, Hairell, Robertson and Esparza on the Section 404 and 406 claims is REVERSED, and the cause is REMANDED for the district court in its discretion to determine the appropriate relief to be afforded the Secretary. The judgment in favor of appellees Carter and Perrin is VACATED and the cause is REMANDED for further proceedings consistent with this opinion. The award of attorneys' fees to the appellees is REVERSED. The award of attorneys' fees to Allied Bank is AFFIRMED.
 
 
 
 [1]
 Pub.L. No. 93-406, 88 Stat. 829 (codified in scattered sections of U.S.C.) (1974)
 
 
 [2]
 See L. Kelso & P. Hetter, Two Factor Theory: The Economics of Reality (1967); L. Kelso & M. Adler, The Capitalist Manifesto (1958); but see Carlson, ESOP and Universal Capitalism, 31 Tax.L.Rev. 289 (1976) (questioning some of the social benefits claimed for ESOPs). Others have recommended the ESOP as a device for achieving a variety of objectives for its corporate sponsor, such as financing of acquisitions or divestitures, or for the sponsor's major shareholders as an estate and planning tool. See generally Employee Stock Ownership Plans 109-40 (J. Bachelder ed. 1979)
 
 
 [3]
 Cunningham, Fritcher, Hairell, Robertson and Esparza
 
 
 [4]
 Shortly before the second sale of stock to the ESOP, another transaction substantially increased the outstanding shares of MCS. In January 1977, Cunningham had exchanged all the stock in his wholly-owned company, Metro Contract Services, Inc., ("Metro") for 9,000 shares of MCS stock. Thereafter, Metro was operated as a wholly-owned subsidiary of MCS, and MCS had 19,100 shares outstanding. Following the second ESOP transaction, Cunningham held 12,660 MCS shares and the ESOP held 6,440
 
 
 [5]
 The plaintiff class was eventually redefined to include all participants in the Metropolitan ESOP
 
 
 [6]
 The Alabama lawsuit also comprised claims relating to other ESOPs and other transactions. Due to the presence of additional parties and issues in the Alabama lawsuit, the Judicial Panel on Multi-District Litigation denied the defendants' motion to consolidate that case with the present one
 
 
 [7]
 The attorney for the plaintiffs in the Alabama lawsuit is to serve as trustee. The agreement also provided for payment by MCS and its insurers of attorneys' fees and costs incurred by the plaintiffs in the Alabama lawsuit
 
 
 [8]
 The Secretary's claims for other equitable relief are discussed at note 10, infra
 
 
 [9]
 See United States v. W.T. Grant, Inc., 345 U.S. at 632, 73 S.Ct. at 897; Alton & So. Ry. v. International Ass'n. of Machinists & Aerospace Workers, 463 F.2d 872, 880 (D.C.Cir.1972) ("When the court views the public interest as greater a lesser possibility of repetition may suffice [to preclude a finding of mootness]."); 13 C. Wright et al, supra, at 267-68
 
 
 [10]
 A number of courts have suggested that a prior private settlement may limit the scope of the relief that the government may seek on behalf of the settling parties. EEOC v. Kimberly-Clark Corp., 511 F.2d at 1361. See also New Orleans Steamship, 680 F.2d at 25; Truvillion v. King's Daughters Hospital, 614 F.2d 520, 525 (5th Cir.1980) (stating, in dicta, that "the E.E.O.C. may not bring a second suit based on the transactions that were the subject of a prior suit by a private plaintiff, unless the E.E.O.C. seeks relief different from that sought by the individual."); EEOC v. Huttig Sash & Door Co., 511 F.2d 453, 456 (5th Cir.1975) (dicta). The appellees thus argue that any claims for monetary relief by the Secretary on behalf of the ESOP participants are barred by res judicata. The Secretary responds that because the equitable remedies of disgorgement or constructive trust are intended to prevent unjust enrichment, see V A. Scott, Trusts, Sec. 462.2 (3d ed. 1967), they are available to the government, even if any payments to the ESOP participants would be barred. Cf. VI L. Loss, Securities Regulation 3574 (2d ed. Supp.1969) (suggesting that those who reap illicit profits by trading on inside information may be required to disgorge them to the government when injured purchasers or sellers cannot be traced)
 Because the district court found for the defendants, these arguments were not considered below. In their briefs to us, the parties have not adequately addressed the issues raised by these remedial arguments in the special context of ERISA. Since all the substantive issues in this case are raised by the Secretary's claims for injunctive relief, and since our holding will necessitate a remand anyway, we think the best approach is for the district court to first consider the disgorgement claims when it determines the scope of relief on remand.
 
 
 [11]
 Contrary to appellees' suggestion, Montana v. United States, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), has no application here. In Montana, the United States had caused private parties to initiate a lawsuit and had effectively controlled the litigation throughout. Id. at 155, 99 S.Ct. at 974. The Supreme Court held that in those circumstances, the United States would be collaterally estopped to relitigate issues decided in the private suit. Although the record in the present case indicates that the Secretary consulted and cooperated with counsel for the Alabama plaintiffs to a limited extent, the government did not have a "sufficient 'laboring oar' in the conduct of the [Alabama] litigation to actuate principles of estoppel." Id
 
 
 [12]
 29 U.S.C. Sec. 1002(21)(A) (1976)
 
 
 [13]
 Congress expressed this policy in the statute itself:
 It is hereby declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.
 29 U.S.C. Sec. 1001(b) (1976).
 
 
 [14]
 Section 404 also includes a general requirement of diversification of plan assets, 29 U.S.C. Sec. 1104(a)(1)(C) (1976), but provides that the requirement is not violated by an investment in employer securities by an ESOP. Id Secs. 1104(a)(2), 1107(d)(5) & (6)
 
 
 [15]
 S.Rep. No. 127, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4838, 4866; H.R.Rep. No. 533, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4639, 4649-51; H.R.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 5038, 5076. ERISA's modifications of existing trust law include imposition of duties upon a broader class of fiduciaries, 29 U.S.C. Sec. 1002(21) (1976), prohibition of exculpatory clauses, id. Sec. 1110(a), broad disclosure and reporting requirements, id. Secs. 1021-31, and nationwide uniformity of rules. See generally H.R.Rep. No. 533, supra, 1974 U.S.Code Cong. & Ad.News at 4649-51
 
 
 [16]
 Section 406, 29 U.S.C. Sec. 1106 (1976), is the principal prohibited transaction section:
 (a) Except as provided in section 1108 of this title:
 (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--
 (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
 (B) lending of money or other extention of credit between the plan and a party in interest;
 (C) furnishing of goods, services, or facilities between the plan and a party in interest;
 (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or
 (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.
 (2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.
 (b) A fiduciary with respect to a plan shall not--
 (1) deal with the assets of the plan in his own interest or for his own account,
 (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
 (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.
 (c) A transfer of real or personal property by a party in interest to a plan shall be treated as a sale or exchange if the property is subject to a mortgage or similar lien which the plan assumes or if it is subject to a mortgage or similar lien which a party-in-interest placed on the property within the 10-year period ending on the date of the transfer.
 Section 407, 29 U.S.C. Sec. 1107 (1976), limits the amount of employer-issued securities that may be held by most plans, but specifically exempts ESOPs from its limitations. Id. Secs. 1107(b)(1), (d)(3)(A) & (6).
 
 
 [17]
 29 U.S.C. Secs. 1106(a)(1)(A) & (D) (1976). ERISA defines "party in interest" to include any fiduciary, employer of employees covered by the plan, or officer or director of such employer. 29 U.S.C. Sec. 1002(14) (1976). The district court correctly found that Cunningham was a party in interest with respect to the Metropolitan ESOP
 
 
 [18]
 29 U.S.C. Sec. 1106(b) (1976)
 
 
 [19]
 The statute also requires that no commission be charged with respect to the transaction. 29 U.S.C. Sec. 1108(e)(2) (1976). No issue has been raised regarding a commission in the present case
 
 
 [20]
 Accordingly, we need not address the issue whether in some circumstances fiduciaries may violate the "sole benefit" rule by entering into a transaction for adequate consideration that benefits parties other than the plan participants. Compare Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir.1982) and 19 Business Organizations, S. Young, Pension and Profit Sharing Plans Sec. 6.15[b] at 6-122 ("[A]n ESOP's acquisition of employer stock from the employer corporation, or from an existing shareholder, would satisfy the exclusive benefit requirement of ERISA ..., so long as the investment is one that is prudent for an ESOP fiduciary and the purchase price does not exceed fair market value."), with Note, The Duties of Employee Benefit Plan Trustees Under ERISA in Hostile Tender Offers, 82 Colum.L.Rev. 1692, 1715-19 (1982) (suggesting that incidental benefits accruing to non-participants may violate section 404)
 
 
 [21]
 All other alleged violations but one are based on adequacy of consideration. The Secretary alleged that the fiduciaries violated section 404 by failing to follow the plan document requirement to purchase stock for fair market value. He alleged that Carter and Perrin knew of the violations by the other fiduciaries and either concealed them or failed to act to remedy them in violation of Section 405. 29 U.S.C. Sec. 1105 (1976)
 The only allegation not dependent on the adequacy of the stock price is that Cunningham violated the terms of the plan document (and consequently Section 404) by participating in the decision to buy his stock. That issue is discussed below.
 
 
 [22]
 It should not be necessary to point out that the appropriate means of implementing that legislative intent is by way of an orderly regulatory proceeding, 29 U.S.C. Sec. 1135 (1976), not by attempting to convince a court to short-circuit the process
 
 
 [23]
 See, e.g., Economic Recovery Tax Act of 1981, Pub.L. No. 97-34, 95 Stat. 172 (1981); Tax Reform Act of 1976, Pub.L. No. 94-455, 90 Stat. 1520 (1976); Tax Reduction Act of 1975, Pub.L. No. 94-12, 89 Stat. 26 (1975); Regional Rail Reorganization Act of 1973, Pub.L. No. 93-236, 87 Stat. 985 (1974); ERISA, supra. For an in-depth description of the manner in which these and other pieces of legislation have encouraged ESOP formation, see J. Bachelder & R. Rizzo, ESOPs, TRASOPs, PAYSOPs and Other Employee Stock Ownership Plans, 18-23 (1982); Hutchinson, Employee Stock Ownership Plans: A New Tool in the Collective Bargaining Inventory?, 26 Am.U.L.Rev. 536 (1977)
 
 
 [24]
 "The Congress is deeply concerned that the objectives sought by [the series of laws encouraging ESOPs] will be made unattainable by regulations and rulings which treat employee stock ownership plans as conventional retirement plans, which reduce the freedom of the employee trusts and employers to take the necessary steps to implement the plans, and which otherwise block the establishment and success of these plans." Tax Reform Act of 1976, Pub.L. No. 94-455, Sec. 803(h), 90 Stat. 1590 (1976)
 
 
 [25]
 Except those relating to diversification. 29 U.S.C. Sec. 1104(a)(2) (1976)
 
 
 [26]
 29 U.S.C. Sec. 1104(a)(1)(B) (1976). Some commentators have suggested that the reference in Section 404 to a prudent man "familiar with such matters" creates a "prudent expert" standard under ERISA. E.g. Cummings, Purposes and Scope of Fiduciary Provisions under the Employee Retirement Income Security Act of 1974, 31 Bus.Law. 15, 35-36 (1975). However, a review of the relevant history of Section 404 does not support this view; rather, it confirms that the emphasis of Section 404 is on flexibility. See Klevan, Fiduciary Responsibility Under ERISA's Prudent Man Rule: What are the Guideposts?, 44 J.Tax. 152 (1976) (surveying history of ERISA and of the precursor of ERISA's fiduciary provisions, H.R. 16462); see also Hutchinson, The Federal Prudent Man Rule Under ERISA, 22 Vill.L.R. 15, 26-27, 42 (1976-77); Little & Thrailkill, Fiduciaries Under ERISA: A Narrow Path to Tread, 30 Vand.L.Rev. 1, 12-13 (1977). The level of knowledge required of a fiduciary will vary with the nature of the plan
 
 
 [27]
 As the Supreme Court has observed in a different context, it seems "fair and reasonable" to place the burden of proof upon a party who seeks to bring his conduct within a statutory exception to a broad remedial scheme. SEC v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953). This is especially appropriate where, as here, the parties claim the exemption for conduct with respect to which they have an inherent, though statutorily permitted, conflict of interest. Marshall v. Snyder, 572 F.2d 894, 900 (2d Cir.1978) (burden of proof is on ERISA fiduciary claiming a Section 408 exemption from self-dealing prohibition of Section 406)
 
 
 [28]
 As the district court put it, "good faith [entails] not only the sole motivation of benefiting the ESOP but also the application of sound business principles of evaluation." 541 F.Supp. at 284
 
 
 [29]
 In their briefs, appellees contend that these facts confirm their decision--we discuss them in detail below. See note 42, infra
 
 
 [30]
 Similarly, the projected growth in income had failed to pan out. Rotan Mosle had assumed that after-tax income would rise from $226,000 to $400,000 during fiscal 1976--an even more dramatic rate of increase (77 percent) than that estimated for revenues--and that this growth rate would continue indefinitely. According to MCS's audited financial statements, actual after-tax income in fiscal 1976 and 1977 was $43,000 and $53,000, respectively. ESOP contributions of $289,000 in 1976 and $318,000 in 1977 were deducted in arriving at these figures. As we explain below, there is some controversy regarding whether ESOP contributions always should be deducted from income for valuation purposes. However, even if the entire ESOP contribution is added back in each year, income remains well below the growth level projected by Rotan Mosle (even without adjustment to eliminate the tax benefit of the ESOP contributions)
 
 
 [31]
 Obviously, there is some level of growth that would be sufficiently great to offset the effect of any delay in achieving a lower projected increase. However, the appellees had a duty to do more than just assume that such an increase was in the offing
 
 
 [32]
 It is doubtful that the $12.6 million in actual revenues is the appropriate figure to compare with the Rotan Mosle projections. At least $4 million of that figure is attributable to a contract acquired through a series of transactions with Metro, another Cunningham company. First, MCS purchased all the stock of Metro from Cunningham in exchange for 9,000 shares of MCS stock. See note 4, supra. A few months later, MCS sold all the Metro stock to Mr. Esparza. In connection with this sale, the parties testified that a large government contract held by Metro was "novated" in favor of MCS. Some $4 million of the 1978 MCS revenue was generated by this contract. Since that revenue was acquired by MCS by virtue of a series of transactions that increased its outstanding stock by 9,000 shares--89 percent--probably it should not be considered in comparing actual revenues with those anticipated by Rotan Mosle. But whether the appellees are deemed to have foreseen 1978 revenues of $12.6 or 8.6 million does not signify; either figure reflects a rate of growth significantly less than that used to establish the $200 price for MCS stock
 
 
 [33]
 Although Rotan Mosle's report states that it was "prepared solely to assist management in determining an appropriate common stock value for establishing an Employee Stock Ownership Trust," it is clear that the financial effect of an ESOP was not considered in setting the $200 appraised price. The report makes clear that MCS was appraised "as of" a date before any ESOP was in place. Moreover, while the MCS financial statements were recast to reflect certain other assumptions about the company's future, such as non-recurring expenses, no adjustments were made to take into account the effect of an ESOP upon MCS's financial condition. Indeed, there is no other mention of ESOPs in Rotan Mosle's report. Mr. Mark Andrews, the principal draftsman of the Rotan Mosle report, testified: "We valued 100 percent of the stock, and we left it up to the company and its other advisors to determine whether due to the specifics of the ESOP that they eventually set up any discount might or might not be appropriate and we stated that." Andrews depo. at 101
 
 
 [34]
 In his deposition, Mr. Cunningham had testified that he could not "swear to" whether this issue had been discussed before the ESOP transactions. Cunningham depo. at 258. Mr. Moroney, the Rotan Mosle officer, testified that he did not think it had been addressed at that time. Moroney depo. at 64
 
 
 [35]
 Another potential cash drain will be occasioned by the operation of an ESOP when the company undertakes to repurchase shares distributed to participants upon termination of their interests in the plan. An enforceable right to require the company to repurchase such shares is known as a "put." Although the Metropolitan ESOP plan document did not grant its participants a put upon termination, all the appellees that testified on the subject stated that their understanding at the time of the ESOP transactions was that MCS would repurchase all stock distributed to terminating plan participants. The district court relied in part upon this intent in holding that a discount for lack of marketability was inappropriate
 Depending upon the number of plan participants, the plan's vesting schedule, and the timing of the termination of the participants' interests, the impact upon MCS cash flow of the stock repurchases anticipated by the appellees could have been significant. As was true regarding the projections and ESOP contributions, the appellees have not shown that they made any attempt to assess the effect of this new factor upon the Rotan Mosle appraisal.
 
 
 [36]
 1959-1 Cum.Bull. 237, modified, Rev.Rul. 65-193, 1965-2 Cum.Bull. 370
 
 
 [37]
 Contrary to the Secretary's arguments to us, Revenue Ruling 59-60 itself makes clear that the valuation principles discussed therein are merely factors to be weighed in each case, not per se rules to be applied reflexively. "No general formula may be given that is applicable to the many different valuation situations arising in the valuation of such stock." 1959-1 Cum.Bull. at 237
 
 
 [38]
 In support of its conclusion that no discount due to the minority interest was required in this case, the district court held that under ERISA, a fiduciary must discharge his corporate management role in the interests of the plan beneficiaries, 541 F.Supp. at 285, and that if the fiduciary is a control owner, he must deal with his own stock in the interest of the beneficiaries. Id. at 286 n. 8. Therefore, the court apparently reasoned that the ESOP would obtain the benefit of effective control ownership by operation of law. These holdings are legally erroneous. As we have explained, ERISA contemplates that fiduciaries will sometimes occupy positions giving rise to dual loyalties; however, by their terms, Sections 404 and 406 impose duties upon these persons in their capacities as plan fiduciaries. The cases cited by the district court hold nothing more than this. NLRB v. Amax Coal Co., 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981); Donovan v. Bierwirth, supra. "ERISA does not relieve plan fiduciaries of obligations arising out of nonplan relationships. For example, the board of directors and administrators of the employer have responsibilities to others, such as shareholders, that they cannot disregard in favor of plan participants and beneficiaries." 19B Business Organizations, S. Young, Pension and Profit-Sharing Plans Sec. 17.02 at 17-23, 17-24. See also Curren v. Freitag, 432 F.Supp. 668, 672 (S.D.Ill.1977). Similarly, we are unwilling to subject the dealings of such fiduciaries with their own stock to the rigors of scrutiny under ERISA without express congressional direction. We doubt that many potential fiduciaries would be willing to serve if required to deal with their own assets and conduct their own affairs "with an eye single to the interests of the participants and beneficiaries." Bierwirth, 680 F.2d at 271
 Whether a discount is appropriate in the circumstances of this case will become important if the district court decides on remand that any monetary relief is appropriate. See note 10, supra. If it becomes necessary to determine the amount by which $200 per share exceeded adequate consideration, the district court should consider the extent to which its erroneous view of the law affected its determination that a discount was not necessary.
 
 
 [39]
 The appellees point to several other facts that they say support their contention that adequate consideration was paid by the ESOP. We do not agree that they are sufficient to satisfy appellees' burden of proof in light of their heavy reliance upon the defective appraisal
 Cunningham asserts that his exchange of Metro shares for MCS shares at the rate of $200 per share in January of 1977 establishes that the price was adequate. See note 4, supra. It does not. Cunningham remained in control of MCS both before and after the transaction. Moreover, by virtue of the first ESOP transaction in August 1976, he knew that the ESOP would provide a ready market at $200 for the MCS shares he acquired for Metro; indeed, he sold 5,000 more shares to the ESOP at that price less than a month later. The Metro exchange was simply not the sort of arms-length transaction that can serve as a barometer of fair market value.
 The appellees also argue that evidence of certain stock options granted to two MCS employees verify a price of $200 per share. We think the most telling answer to this contention is that when asked to explain the basis of their decision that the Rotan Mosle appraisal remained valid, none of the appellees cited the options as a factor. Even if they had been considered, they are slim indications of fair market value. Fritcher had been granted an option to buy 500 shares in 1974 at $140 per share. However, he did not exercise it, choosing instead to take the difference between $140 and $200 per share in cash. Though indicative that the shares were not thought to be worth more than $200, this transaction does not establish that they were not worth much less--incentive stock options are frequently granted at prices in excess of current fair market value as an inducement for employees to work to increase the value of the company. They are not proxies for arms-length transactions. For the same reason, an option to purchase stock at $200 per share granted to Perrin in mid-1977 is equally unpersuasive.
 Finally, the appellees urge that two bona fide arms-length offers to purchase all the MCS stock corroborate their determination that $200 per share was adequate consideration. Only one of these offers occurred before the ESOP transactions: in April 1975, MCS received an offer to purchase the entire company for $1.6 million or $158 per share. Significantly, the Rotan Mosle report stated that its evaluation was based in part upon this offer. Accordingly, the offer is not additional information that the appellees could have used to evaluate the continuing validity of Rotan Mosle's conclusion. It does nothing to offset the facts that we have discussed which show that the appellees should have questioned the appraised figure. The second offer from a third party--$162.50 per share--came in 1979, long after the ESOP transactions, and could hardly have been a factor in the appellees' decision.
 
 
 [40]
 Section 405(a) provides for the liability of cofiduciaries in various circumstances:
 In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
 (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
 (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
 (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.
 29 U.S.C. Sec. 1105(a) (1976).
 
 
 [41]
 "In any action under this subchapter by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. Sec. 1132(g) (1976)
 
 
 [42]
 Accordingly, we need not reach the claim raised in Allied Bank's cross-appeal that its fees and costs are recoverable under indemnity agreements executed by MCS and Cunningham. See 541 F.Supp. at 289-90